UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Shane Edward Casey,

      Plaintiff,

      v.                                        Civil Action No. 5:12-cv-284

Andrew Pallito, et al.,

      Defendants.

## REPORT AND RECOMMENDATION
(Docs. 52, 56)

Plaintiff Shane Edward Casey, an inmate in the custody and control of the

Vermont Department of Corrections ("DOC"), has filed this action *pro se* pursuant to 42

U.S.C. § 1983,[1] alleging that Defendants, various DOC officials, violated his rights under

the First, Eighth, and Fourteenth Amendments, as well as his statutory rights under the

Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc-

2000cc-5. Presently pending before the court is Defendants' Motion to Dismiss for

failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P.

12(b)(6). (Doc. 52.) Casey has also moved for the appointment of counsel. (Doc. 56.)

---

[1] The Amended Complaint (Doc. 57) does not explicitly reference 42 U.S.C. § 1983 as the basis
for Casey's cause of action. Nevertheless, I treat this case as having been brought pursuant to that section
because both the original Complaint reflects as much (Doc. 4 at 1) and the Amended Complaint includes
a reference to "this filing of a 1983 lawsuit" (Doc. 57 at 28).

For the reasons that follow, I recommend that the Motion to Dismiss be GRANTED in part and DENIED in part; the Motion for Appointment of Counsel is DENIED.

### Facts and Procedural Background

Shane Edward Casey, incarcerated in a Vermont DOC facility since January 4, 2008 (Doc. 57 at 1), is currently serving two concurrent sentences of twenty years to life on two counts of aggravated sexual assault (Doc. 52 at 1; Doc. 57 at 1).  On June 15, 2011, while incarcerated at the Chittenden Regional Correctional Facility ("CRCF"), Casey met inmate Martin Morales.[2]  (Doc. 57 at 2.)  Morales was a pre-trial detainee awaiting trial for allegations of attempted second degree murder, burglary, first degree aggravated domestic assault with a weapon, and violation of an abuse prevention order.  (*Id*. at 7.)  Morales had been designated "severely functionally impaired" by DOC staff.[3]  (*Id*. at 8.)  In summary, Casey claims that prison authorities began to suspect that Casey was engaging in a predatory sexual relationship with Morales.  During the course of the investigation into his alleged predation, Casey was deprived of certain privileges afforded to other inmates, including termination from his facility employment, brief placements in administrative segregation, and movement to a new living unit and

---

[2]  Morales was formerly a coplaintiff in the instant case, but was dismissed as a party, by stipulation, on April 15, 2013.  (Doc. 51.)  Because Morales has been dismissed from the case, allegations in the Amended Complaint that relate only to Morales are not included in this recitation of facts.

[3]  A "serious functional impairment" is defined under Vermont law as "a disorder of thought, mood, perception, orientation, or memory as diagnosed by a qualified mental health professional, which substantially impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life and which substantially impairs the ability to function within the correctional setting; or . . . a developmental disability, traumatic brain injury or other organic brain disorder, or various forms of dementia or other neurological disorders, as diagnosed by a qualified mental health professional, which substantially impairs the ability to function in the correctional setting."  28 V.S.A. § 906(1).

(eventually) to a new facility entirely.  Casey denies having a sexual relationship with Morales and claims that the actions against him were taken in retaliation for his exercise of his religious beliefs, to stifle his access to the courts, or to limit his association with Morales.

At the time he met Morales, Casey was employed at the CRCF law library and gym.  (Doc. 57 at 2.)  Casey "go[t] to know" Morales at this time while "assisting" Morales through his work in the law library.  (*Id*.)  According to Casey, Morales informed him that he was "either an ath[ei]st or agnostic" and Casey responded that he was a "Christian and attended the non-denominational Christian services on Sundays." (*Id*.)  Upon Casey's invitation, Morales attended multiple such services with him.  (*Id*. at 3.)  As the men grew closer, each disclosed to the other their history of sexual abuse, and Casey told Morales that his religion had helped him in his "healing and recovery."  (*Id*.) Morales and Casey "spent many hours alone together in CRCF's law library," but Casey "never acted sexually-inappropriate around Martin Morales."  (*Id*. at 4.)  When CRCF later became a women's prison, all male prisoners at the facility, including Morales and Casey, were transported to Northwest State Correctional Facility ("NWSCF").  For about two weeks after their move to NWSCF, Casey and Morales were cellmates.  (*Id*.) Thereafter, Casey began work as the assistant to NWSCF's recreation coordinator, as well as the facility's law librarian.  (*Id*. at 5.)

On or about May 31, 2012, NWSCF staff began to investigate the possibility that Casey had been sexually abusing Morales.  (*Id*. at 6.)  On that day, Defendant Stone discovered Morales cleaning Casey's cell at around 7:15 a.m.  (*Id*.)  This discovery

3

precipitated a meeting at which Stone and other DOC officials asked Morales whether Casey had ever sexually abused him.  (*Id*. at 7.)  When these authorities did not believe Morales's denials, he was moved into a different unit and Casey was placed into administrative segregation.  (*Id*. at 8.)  Stone informed Morales that Vermont State Police were involved in an investigation concerning Casey and stated that he was "looking to press a criminal charge of sexual assault . . . against Shane Casey." (*Id*.)  At a second meeting on May 31, 2012, Morales continued to deny that any abuse had occurred.  (*Id*.)  At this meeting, Morales was subject to a "long line of questioning about statements that were allegedly given by other prisoners against Shane Casey." (*Id*.)  Nearly all of the statements included allegations that Casey had sexually abused Morales.  (*Id*.)  By the conclusion of the investigation that day (at around 3 p.m.), Morales was kept in his new unit and Casey was released from segregation.  (*Id*. at 9.)  Morales filed numerous grievances seeking relief from his new placement.  (*Id*. at 10.)

"[D]uring this time," Casey and Morales became increasingly close and spent more time together practicing their religious belief in Christianity.  (*Id*. at 11.)  The Amended Complaint alleges that DOC "staff became hostile toward [Casey]" as he shared more of his faith.  (*Id*.)  The Amended Complaint further claims that, on June 14, 2012, NWSCF Superintendent Greg Hale transferred Morales to the Northern State Correctional Facility "[o]ut of retaliation over Martin Morales'[s] grievances and Shane and Martin practicing their belief in Christianity."  (*Id*.)  As Morales left the facility, Defendant Stone allegedly informed him that he would never "see Shane Casey

again." (*Id.*)  The Amended Complaint alleges that this, among other things, is evidence of Stone's "personal vendetta" against Casey.[4] (*Id.*)

During Morales's absence from NWSCF, Defendant Hale denied his request for inmate-to-inmate correspondence with Casey.  (*Id.* at 12.)  Similarly, Casey's employment at the NWSCF recreation office "had many new undue restrictions placed on it," such as disallowing him from using the gym facility unsupervised.  (*Id.* at 13.)  Over two months after his transfer, on August 24, 2012, Morales was returned to NWSCF.  (*Id.* at 12-13.)

Upon his return, Morales sought mental health counseling for assistance with issues arising from his past suffering of sexual abuse.  (*Id.* at 15-16.)  When Casey tried to help Morales through his issues, Defendant Hale "retaliated against [their] religious convictions" by having another staff member "threaten" Casey by saying: "If you ever try mediating for Martin Morales again I'll write you a Major [disciplinary report], fire you, and ship you to Kentucky." (*Id.* at 16.)  On October 26, 2012, Casey was terminated from his employment with the NWSCF recreation coordinator.  (*Id.* at 20.)  After initially not being given a reason for his termination, Casey was later told that the decision for his firing had come from Defendant Hale.  (*Id.*)  By way of explanation, Hale informed Morales that NWSCF was a "transitional facility" and thus he did not want "the same people working the same jobs for too long." (*Id.*)  According to the Complaint, the facility's recreation coordinator was "extremely upset" with Casey's termination.  (*Id.* at

---

[4] Casey also claims that Stone was responsible for his wife's deportation following her acceptance of a plea bargain on related charges for which she was Casey's codefendant.  (Doc. 57 at 11.)

21.)  Morales also grieved Casey's firing.  (*Id*. at 22.)  After Casey's termination, Defendant Davies placed Casey on "15-minute close observation checks," which Casey characterizes as "retaliation," courtesy of Hale, to cause sleep deprivation and thereby render Casey unable to "meaningful[ly] access the courts, litigate, and/or practice his religion."  (*Id*. at 25.)  "A few days" later, Hale moved Casey to a different living unit, described in the Amended Complaint as a "violent, drug-infested unit, usually reserved for prisoners with behavior issues."  (*Id*. at 22.)  This placement was "designed as punishment and to stifle access to the courts so Martin Morales and Shane Casey could not work on their lawsuits and grievances together."  (*Id*. at 25.)

On November 5, 2012, Defendants Hale and Davies, as well as other DOC officials, conducted a meeting with Casey.  (*Id*. at 23.)  At this meeting, Hale claimed that he terminated Casey so as to "limit [his] contact with Martin Morales."  (*Id*.)  Hale claimed that he did so because Casey was a "convicted sex-offender, a monster, a child-molester, [and] a pedophile."  (*Id*.)  Hale also allegedly threatened Casey, telling him that he would place him in administrative segregation if he contacted Morales, either to offer legal assistance or religious advice.  (*Id*.)  Casey responded that "serving others is part of his religion and that he is look[ed] up to as a spiritual authority by many members newer in the faith."  (*Id*.)  He also cited the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), noting that he retained his freedom to exercise his religion within the confines of prison security.  (*Id*.)  Hale reiterated his suggestion that Casey have no contact with Morales.  (*Id*.)  At this meeting, Hale also fired Casey from his position at the law library.  (*Id*.)

6

"During this time," Hale, as well as other DOC staff, would "give [Casey] looks of contempt in the hallways of the main building." (*Id*. at 24.)  Hale also allegedly used the recreation schedule "to punish Shane Casey and Martin Morales for litigation and religious expression." (*Id*. at 25.)

At some point thereafter, Casey was transferred to the Northern State Correctional Facility. (*Id*. at 26-27.)  Casey, who suffers from multiple sclerosis (*id*. at 5), claims that his medication "to treat and prevent disease progression was not shipped with him" during this transfer (*id*. at 27).  Casey contends that Hale did so in order to interfere with Casey's "treatment schedule as ordered by his neurologist and facility doctors." (*Id*. at 27.)

Casey filed his Complaint on January 8, 2013.[5]  (Doc. 4.)  Although he originally brought suit against a number of DOC officials (Doc. 4 at 1), Casey subsequently

---

[5]  In addition to his Complaint (Doc. 4) and Amended Complaint (Doc. 57), Casey has also filed numerous supplemental documents and exhibits.  (*See* Docs. 7, 8, 9, 13, 14, 53, 54, 55.)  This documentation consists primarily of grievance forms filed during the events described in the Amended Complaint (Doc. 7 at 10-65; Doc. 8 at 72-78; Doc. 55-1; Doc. 55-3; Doc. 55-5; Doc. 55-7; Doc. 55-9; Doc. 55-11; Doc. 55-13; Doc. 55-15; Doc. 55-17; Doc. 55-20), responses to grievances from DOC personnel (Doc. 55-19; Doc. 55-27), special depositions (Doc. 8 at 2-14), documentation supporting Morales's claim of having suffered past sexual abuse at the hands of a priest (Doc. 8 at 15-25), a March 27, 2012 civil complaint filed by Morales against the Roman Catholic Diocese of Albany, and other defendants, in New York state court (Doc. 8 at 26-43), various affidavits (Doc. 8 at 48-65; Doc. 9-1; Doc. 9-3; Doc. 9-54; Doc. 9-55; Doc. 53-1; Doc. 53-3; Doc. 54-1; Doc. 54-2; Doc. 54-3; Doc. 54-4; Doc. 54-5; Doc. 54-6; Doc. 54-9; Doc. 54-10; Doc. 54-11; Doc. 57-1), letters written by Casey (Doc. 8 at 66-69; Doc. 9-7; Doc. 9-8; Doc. 54-12; Doc. 55-22), descriptions of Casey's religious beliefs (Doc. 7 at 8-9; Doc. 9-2; Doc. 53-2), a description of restrictive intra-DOC mailing practices that limited correspondence between Casey and Morales (Doc. 13; Doc. 55-23; Doc. 55-25), a records request brought in Vermont state court (Doc. 14), and correspondence between Casey and Morales (Doc. 15-1).

I note that, although much of this documentation seems to have been filed in support of Casey's claim of innocence of the charges for which he stands incarcerated (Doc. 9-7; Doc. 9-8; Doc. 9-9; Doc. 9-10; Doc. 9-12; Doc. 9-13; Doc. 9-15; Doc. 9-16; Doc. 9-17; Doc. 9-18; Doc. 9-19; Doc. 9-20; Doc. 9-21; Doc. 9-22; Doc. 9-23; Doc. 9-24; Doc. 9-26; Doc. 9-27; Doc. 9-28; Doc. 9-29; Doc. 9-30; Doc. 9-31; Doc. 9-32; Doc. 9-33; Doc. 9-34; Doc. 9-35; Doc. 9-36; Doc. 9-37; Doc. 9-38; Doc. 9-39; Doc. 9-40; Doc. 9-41; Doc. 9-46; Doc. 9-48; Doc. 9-56; Doc. 54-8), a claim of innocence is better brought as a

amended his Complaint to include only four Defendants—Andrew Pallito (the Vermont Commissioner of Corrections), Greg Hale (Superintendent at NWSCF), Dan Davies ("CLUS" at NWSCF), and Kory Stone (former caseworker at NWSCF)—all sued in both their individual and official capacities (Doc. 57 at 1). Casey claims that Defendants violated his First, Fourteenth, and Eighth Amendment rights, as well as protections afforded him under RLUIPA. (*Id.* at 33.) With respect to relief, Casey seeks: (1) waiver of service and summons on all Defendants; (2) appointment of counsel; (3) that DOC officials not retaliate against him or punish him for practicing his religious beliefs; (4) that no other DOC "staff, volunteer, contract member, prisoner, or other person" assist in such retaliatory or punitive behavior against him; (5) compensatory damages in the form of $40 wages lost every two weeks from October 26, 2012 to the present and $4 every two weeks from November 6, 2012 to the present for wrongful termination from his recreation and law library positions; (6) $1,000,000 for "undo pain and suffering" caused by aggravating his "pre[]existing medical condition that was made known and was acknowledged by DOC Staff"; and (7) nominal damages that this court "deems appropriate."[6] (Doc. 57 at 30.) Despite his inclusion of a request for counsel in his Amended Complaint (*Id.*), Casey has also moved separately for the appointment of counsel (Doc. 56).

---

petition for a writ of habeas corpus and is not cognizable under § 1983. *See Heck v. Humphrey*, 512 U.S. 477, 486 (1994) ("the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement").

[6] After filing his original Complaint, Casey filed two Motions for Summary Judgment before discovery even began (Doc. 6; Doc. 10), which were denied as premature (Doc. 17; Doc. 46).

Defendants moved to dismiss the original Complaint.  (Doc. 52.)[7]  Casey declined

to file a response, opting instead to move for the appointment of counsel.  (Doc. 56.)

## Discussion

Title 42 U.S.C. § 1983 provides a civil claim for damages against "[e]very person

who, under color of any statute . . . of any State . . . subjects, or causes to be subjected,

any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws . . . ."  42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state

actors from using the badge of their authority to deprive individuals of their federally

guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt v. Cole*,

504 U.S. 158, 161 (1992).  To succeed on a § 1983 claim, a plaintiff must allege: "(1) the

---

[7]  The pending Motion to Dismiss (Doc. 52) was filed in relation to the original Complaint (Doc. 4), which was then amended (after the filing of the pending motion) by Casey's filing of an Amended Complaint (Doc. 57).  While I recognize that the Amended Complaint was filed outside the twenty-one day window for the filing of amendments "as a matter of course," Fed. R. Civ. P. 15(a)(1), and without Defendants' consent or leave to amend, Fed. R. Civ. P. 15(a)(2), I accept Casey's filing of the Amended Complaint given his status as a *pro se* litigant, the fact that the rule notes that leave (if sought) should be "freely give[n], Fed. R. Civ. P. 15(a)(2), and the stipulated dismissal of his coplaintiff that preceded this filing.  *See Washington v. Reilly*, 226 F.R.D. 170, 171 (E.D.N.Y. 2005) (forgiving procedural defects in filing of amended complaint by *pro se* litigant); *Bristol Village, Inc. v. Louisiana-Pacific Corp.*, No. 12-CV-263S, 2013 WL 55698, at *2 (W.D.N.Y. Jan. 3, 2013) (construing late filing of amended complaint as a request for leave to file an amended complaint and granting that request); *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 372 (S.D.N.Y. 2002) (noting that "courts have agreed to consider an amended complaint served without judicial permission as long as the court would have granted leave to amend if it had been sought and none of the parties would be prejudiced by allowing the change"); *see also* 6 Charles Alan Wright et al, Federal Practice and Procedure § 1484 (3d ed. 2013) ("Permitting an amendment without formal application to the court under these circumstances is in keeping with the overall liberal amendment policy of Rule 15(a) and the general desirability of minimizing needless formalities.").  I also note that Defendants have not moved to strike the amended pleading.

Although the Motion to Dismiss predates the Amended Complaint, when "a plaintiff amends its complaint while a motion to dismiss is pending . . . [a] court then has a variety of ways in which it may deal with the pending motion, from denying the motion as moot to considering the merits of the motion in light of the amended complaint."  *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 80 (D Conn. 1994).  Here, as the Amended Complaint is a nearly-verbatim recitation of the original Complaint, offers no new facts that would affect an assessment of the merits, and differs primarily in its listing of named Defendants and prayer for relief, I opt to consider the merits of the pending Motion using the facts as alleged in the Amended Complaint.

defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)); *see also Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Defendants have moved to dismiss on three primary grounds, arguing that Casey's § 1983 claim should be dismissed because: (1) any claim for damages is barred by application of Vermont's sovereign immunity pursuant to the Eleventh Amendment to the United States Constitution; (2) Casey has failed to allege the sufficient personal involvement of all Defendants other than Defendant Hale, as required by § 1983; and (3) the individual claims fail on their merits.[8]

## I.    Motion to Dismiss Legal Standard

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must "provide the grounds upon which [its] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A plaintiff must also allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). "A claim has

---

[8] Defendants have also claimed that they are entitled to qualified immunity, but they have done so solely by virtue of an argument concerning the merits of Casey's underlying claims. (Doc. 52 at 14-15.) These merit-based arguments are therefore addressed in that section.

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As described by the Supreme Court in *Iqbal* and *Twombly*, this does not require a plaintiff to provide "detailed factual allegations" to support his claims, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In assessing the adequacy of the pleadings, a court must accept all factual assertions as true and draw all reasonable inferences in favor of the plaintiff.  *See Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011); *ATSI Commc'ns*, 493 F.3d at 98.  A complaint is properly dismissed, where, as a matter of law, "the allegations in [it], however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Conversely, this presumption of truth "is inapplicable to legal conclusions," and therefore the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) ("We are not . . . bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions" (citation omitted)).

The question on a Rule 12(b)(6) motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims'" raised in the complaint. *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). In essence, the question is whether some plausible narrative supports the plaintiff's claim such that the case merits discovery; the Federal Rules of Civil Procedure "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In cases involving a *pro se* plaintiff, the court must construe the complaint "liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), by "reading such submissions 'to raise the strongest arguments they suggest.'" *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). "This policy of liberally construing *pro se* [complaints] is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d

Cir. 1983)).  In assessing *pro se* complaints challenged by Rule 12(b)(6) motions to dismiss, courts "apply[] a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel."  *Lerman v. Bd. of Elections in City of N.Y.*, 232 F.3d 135, 140 (2d Cir. 2000).  "This is particularly so when the *pro se* plaintiff alleges that h[is] civil rights have been violated."  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Nonetheless, even *pro se* litigants "remain subject to the general standard applicable to all civil complaints under the Supreme Court's decisions in Twombly and Iqbal."  *Brickhouse v. City of New York*, No. 09 CIV. 9353(NRB), 2010 WL 3341845, at *2 (S.D.N.Y. Aug. 16, 2010); *see Bisson v. Martin Luther King Jr. Health Clinic*, No. 07-5416-cv, 2008 WL 4951045, at *1 (2d Cir. Nov. 20, 2008); *see also Triestman*, 470 F.3d at 477 ("*pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law").

## II.    Sovereign Immunity

Defendants first move to dismiss all claims for damages against them in their official capacities, arguing that these claims are barred by Vermont's sovereign immunity under the Eleventh Amendment.[9]

"Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a

---

[9]  The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has also been interpreted to bar federal suits against state governments by a state's own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 15 (1890).

State for alleged deprivations of civil liberties." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989). Federal jurisdiction over suits against unconsenting states or state officials "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). Thus, the Eleventh Amendment bars suits in federal court by private citizens against a state, its agencies, or its officials unless the state has waived its immunity or Congress has properly abrogated that immunity.[10] *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-99 (1984). A state's waiver of Eleventh Amendment immunity must be unequivocally expressed. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985).

As relevant to this case, it bears reiteration that "[t]he [E]leventh [A]mendment also bars suits against state officials and state agencies if the state is the real party in interest, regardless of whether the state is named as a party to the action." *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)). Because an action against federal officers in their official capacities is essentially a suit against the United States, such suits are barred under the doctrine of sovereign immunity.[11] *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir.

---

[10] Congress may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976), but it has not done so in any way relevant to this case. It is well settled that Congress did not intend to abrogate sovereign immunity by the enactment of § 1983. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979).

[11] These "official capacity" claims for damages should also be dismissed because "[n]either a state nor one of its agencies nor an official of that agency sued in his or her official capacity is a 'person' under § 1983." *Spencer v. Doe*, 139 F.3d 107, 111 (2d Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 26 (1991)).

1994) (citing *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471 (1994)).  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. . . . It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Unlike a personal capacity suit, in which an award of damages would be executed only against the official's personal assets, an official-capacity suit results in a damages judgment against the state itself.  *See id.*  As a result, Vermont state officials cannot be subject to suit in their official capacities for retrospective relief, such as money damages, under § 1983.[12]

As relevant here, all Defendants are employees of the Vermont DOC.  The State of Vermont has not waived its sovereign immunity against claims brought against it under § 1983.  *See* 12 V.S.A. § 5601(g) (Vermont Tort Claims Act reserves Eleventh Amendment immunity for all claims not specifically waived).  Thus, to the extent Casey brings his § 1983 claims against Defendants for money damages in their official capacities, those claims should be DISMISSED.

## III.   Personal Involvement

Next, Defendants Pallito, Davies, and Stone argue that certain claims against them should be dismissed for lack of personal involvement.

To recover damages under 42 U.S.C. § 1983, a plaintiff must establish the personal involvement of each of the individual defendants.  It is well established in the

---

[12]  Casey may, however, seek injunctive and declaratory relief against Defendants in their official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Will*, 491 U.S. at 71 (quoting *Graham*, 473 U.S. at 167 n.14).  Thus, to the extent that Casey seeks such relief, those claims are not barred by sovereign immunity.

Second Circuit that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991). In this way, a prison official cannot be held personally liable under § 1983 on the basis of *respondeat superior* or simply because he or she sits atop the prison hierarchy. *See Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995). Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Direct participation, however, is not strictly necessary. Personal involvement can be shown by

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873.[13]

---

[13] There is disagreement within the Second Circuit as to whether the Supreme Court's decision in *Iqbal* abrogated any of the *Colon* categories of supervisor liability. *See Morrissette v. Cripps*, No. 10 Civ. 8795(JGK), 2011 WL 4089960, at *2 (S.D.N.Y. Sept. 14, 2011) (recognizing disagreement); *Aguilar v. Immigration & Customs Enforcement Div. of U.S. Dept. of Homeland Sec.*, 811 F. Supp. 2d 803, 814 (S.D.N.Y. 2011) ("The Court of Appeals has not yet definitively decided which of the *Colon* factors remains a basis for establishing supervisory liability in the wake of *Iqbal*, and no clear consensus has emerged among the district courts within the circuit."); *Inesti v. Hogan*, No. 11 Civ. 2596(PAC)(AJP), 2013 WL 791540, at *11-12 (S.D.N.Y. Mar. 5, 2013) (Peck, Mag. J.) (noting that *Iqbal* involved a claim of intentional discrimination, and that "[w]here the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in *Colon* may still apply"); *see generally* Desiree L. Grace, Comment, Supervisory Liability Post-*Iqbal*: A

In arguing that they were not personally involved in the alleged constitutional violations at issue, Defendants misunderstand the nature of the personal involvement question.  For example, Defendants claim that they were not personally involved because "an inmate has no protected liberty interest in employment within a facility . . . [n]or does an inmate have a protected liberty interest in his placement within a facility, or even over the facility in which he is held."  (Doc. 52 at 6-7.)  These statements, insofar as they allege that Casey has not raised a cognizable liberty interest, obviously go to the heart of the merits of Casey's constitutional claims.  But the threshold question of personal involvement, properly construed, asks only whether each defendant's actions fall into (at least) one of the *Colon* categories for liability.  If so, the individual was personally involved, liability is not premised on a theory of *respondeat superior*, and a § 1983 claim may be brought against him.  Contrary to Defendants' argument, the court will not then go on to ask whether, to the extent an individual was personally involved, his actions rose to the level of a constitutional violation.  That is a merits question.

Having demystified the inquiry—and being required to accept Casey's allegations as true—it becomes clear that all three Defendants (Pallito, Stone, and Davies) were personally involved in the events giving rise to Casey's constitutional claims.  Pallito, in receipt of Casey's multiple grievances and letters, sent Casey a letter concerning the course of actions his office had taken in response to his complaints.  Casey has included Pallito's letter among his many filings.  (Doc. 55-27.)  Although "[n]umerous courts have

---

"Misnomer" Indeed, 42 Seton Hall L. Rev. 317 (2012).  Defendants, however, have not raised this point, and, seeing as how no Second Circuit decision has specifically overturned *Colon*, I continue to treat it as good law for the purposes of deciding Defendants' motion to dismiss.

held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim," *Candelaria v. Higley*, No. 04-CV-277A, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008), if "the official does personally look into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved," *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citations omitted). Here, the letter from Pallito, despite its assertion that Pallito had forwarded Casey's complaints to certain specified subordinates, provides evidence of his personal engagement with Casey's claims.  As such, Casey has sufficiently alleged Pallito's personal involvement in the alleged constitutional violations. *See Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986).  In the language of *Colon*, Pallito was a supervisory official who, "after being informed of the violation through a report or appeal, failed to remedy the wrong."  *Colon*, 58 F.3d at 873.

Unlike Pallito, Stone and Davies were directly involved in the events giving rise to Casey's claims.  As to Defendant Stone, a caseworker at NWSCF, Casey's Amended Complaint details his central role in the investigation into the allegations of sexual assault against Casey, from discovering Morales in Casey's cell on the morning of May 31, 2012 to repeatedly questioning Morales about the nature of his relationship with Casey.  (Doc. 57 at 6-7.)  Based upon the allegations, "Stone was looking to press a criminal charge of sexual assault . . . against Shane Casey."  (*Id*. at 8.)  On the day of Morales's transfer, Stone told him that he would never "see Shane Casey again."  (*Id*. at 11.)  Overall, Casey claims that Stone "has a personal vendetta" against him, as evidenced by his course of conduct during the events at issue, as well as his role in securing the deportation of

Casey's wife (and codefendant) after her guilty plea.  (*Id*.)  Davies had a similarly direct,

if less active, role in Casey's claimed constitutional violations.  For one, he was present

during a meeting between Hale and other DOC officials on November 5, 2012 in which

Hale justified his actions against Casey.  (*Id*. at 22.)  Davies was also present at a similar

meeting between Hale and Casey in which Hale allegedly threatened Casey with

administrative segregation if he contacted Morales, even to offer religious or legal advice.

(*Id*. at 23.)  Casey also identifies Davies as responsible for his placement on fifteen

minute observation checks, which deprived him of sleep and rendered him "unable to

meaningful[ly] access the courts, litigate, and/or practice his religion."  (*Id*. at 25.)  Such

direct participation unquestionably constitutes personal involvement under *Colon*.

## IV.    The Merits of Casey's Constitutional Claims

Finally, Defendants contend that Casey's claims fail on their merits.  Casey has

grounded his claims in the First, Fourteenth, and Eighth Amendments to the United

States Constitution, as well as the statutory protections of RLUIPA.  I address each claim

seriatim.

### A.    Casey's Religious Liberty Claims

Casey's claims concerning his right to religious liberty derive from two distinct

sources: (1) the Religious Land Use and Institutionalized Persons Act of 2000; and (2)

the Free Exercise Clause of the First Amendment.

Congress enacted RLUIPA as the "latest of long-running congressional efforts to

accord religious exercise heightened protection from government-imposed burdens."

*Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005).  Having found that "frivolous or arbitrary

barriers impeded institutionalized persons' religious exercise," *id*. at 716 (quotation omitted), Congress passed § 3 of RLUIPA to strengthen the protection for religious expression by prisoners.  That section requires that "[n]o [state or local] government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2).  The Act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A), and notes that it "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution," 42 U.S.C. § 2000cc-3(g).  Analysis under § 3 of RLUIPA proceeds through a two-step burden-shifting process: "Where a plaintiff adduces evidence sufficient to show that the government practice substantially burdens her religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest." *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) (citing 42 U.S.C. § 2000cc-2(b)).

In passing RLUIPA, Congress invoked its authority under the Spending and Commerce Clauses; as such, § 3 applies when "the substantial burden [on religious exercise] is imposed in a program or activity that receives Federal financial assistance," or "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes."  42

U.S.C. § 2000cc-1(b).  Congress's invocation of the spending power cuts a wide swath, as "[e]very State . . . accepts federal funding for its prisons."  *Cutter*, 544 U.S. at 716 n.4. "A person may assert a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  42 U.S.C. § 2000cc-2(a).

Defendants argue that "appropriate relief" does not include money damages.  The Supreme Court has recently held that passage of RLUIPA did not waive state sovereign immunity under the Eleventh Amendment, and thus RLUIPA does not provide for damages against state officials in their official capacities.  *Sossamon v. Texas*, 131 S. Ct. 1651, 1661 (2011); *see also Hall v. Ekpe*, 428 F. App'x 93, 94 (2d Cir. 2011).  As for personal capacity claims, Defendants argue that, because it was passed pursuant to the spending power, § 3 of RLUIPA cannot expose individual officers to liability.  Although the Second Circuit has not decided this question, there appears to be a growing consensus in the district courts of this circuit, including this court, that RLUIPA does not expose individual defendants to claims for money damages in their personal capacities.  *See Jean-Laurent v. Lawrence*, No. 12 Civ. 1502(JPO)(SN), 2013 WL 1129813, *7 n.9 (S.D.N.Y. Mar. 19, 2013) (recognizing consensus in support of its conclusion that RLUIPA does not sanction claims for money damages); *Bock v. Gold*, No. 1:05-CV-151, 2008 WL 345890, at *7 (D. Vt. Feb. 7, 2008).  These courts reason that claims for money damages against officials in their individual capacity may tread the limits of Congress's spending power because "individual defendants were not, at least in their individual capacities, 'contracting' parties who received federal funds."  *Pugh v. Goord*, 571 F.

Supp. 2d 477, 506 (S.D.N.Y. 2008) (citation omitted); *Smith v. Allen*, 502 F.3d 1255, 1274 (11th Cir. 2007) ("the courts have consistently recognized the limited reach of Congress'[s] Spending Power legislation, concluding that statutes passed under the Spending Clause may, as a condition of funding, subject the grant *recipient* to liability in a private cause of action, but that the Spending Power cannot be used to subject individual defendants, such as state employees, to individual liability in a private cause of action"). Without explicitly deciding the spending-power issue, courts then typically go on to cite the *Ashwander*[14] principle of constitutional avoidance in support of the alternative reading of the statute barring claims for damages, sidestepping the ultimate question of the scope of congressional power. *See Bock*, 2008 WL 345890, at *7 ("The constitutional avoidance canon states that when a statute is susceptible to two possible constructions, and one raises serious constitutional questions, the other construction must be adopted."). Having found the reasoning of these courts persuasive, I similarly conclude that RLUIPA does not permit claims for damages against individual defendants, either in their official or personal capacities. Any RLUIPA claim for damages should therefore be DISMISSED.

That said, Casey seeks injunctive relief in addition to his claim for damages. This claim for injunctive relief, however, relates only to the conduct of individuals at NWSCF. As far as the Amended Complaint and the records of this court make out, it appears that Casey has been transferred to a new facility. "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring

---

[14] *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

facility." *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) (raising issue of mootness

*sua sponte*); *see also Burton v. Lynch*, 664 F. Supp. 2d 349, 357-58 (S.D.N.Y. 2009)

(dismissing request for injunctive relief as moot where transfer predated filing of

complaint); *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (because inmate was

currently incarcerated in different facility from facilities in which alleged deprivation of

his free exercise rights and right to be free of cruel and unusual punishment allegedly

occurred, his injunctive and declaratory claims against officials of the prior facilities were

moot); *Young v. Coughlin*, 866 F.2d 567, 568 n.1 (2d Cir. 1989); *Beyah v. Coughlin*, 789

F.2d 986, 988 (2d Cir. 1986).  Casey has been transferred, and has not alleged in his

Amended Complaint that he is still being retaliated against at his new facility for his

religious practices.  To the extent that one could read the Amended Complaint to allege

that the transfer itself was retaliation for Casey's exercise of his religion, this reading is

undercut by the fact that Casey has not sought an injunction to force his return to

NWSCF.  Rather than request a transfer, Casey asks only that DOC-affiliated individuals

("staff, volunteer[s], contract member[s], prisoner[s], or other person[s]") not "retaliate or

punish" (or "aid[,] abet, or assist in such retaliatory/punitive behavior") him "in any way .

. . for practicing his belief in Christianity."  (Doc. 57 at 30.)  But this request for

injunctive relief "is premised on conditions he experienced while at [NWSCF],"

predating his transfer.  *Alster v. Goord*, 745 F. Supp. 2d 317, 332 (S.D.N.Y. 2010).  The

request for injunctive relief is therefore moot; "the relief sought can no longer be given

[and] is no longer needed." *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983).[15]

Accordingly, Casey's claim for damages is not cognizable under RLUIPA, and his claim for injunctive relief is rendered moot by his transfer away from the facility where the events giving rise to his claim took place. Casey's RLUIPA claim should thus be DISMISSED in its entirety.

Turning to Casey's constitutionally-grounded claim, cases under the Free Exercise Clause brought by inmates are judged by application of a "'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid*, 850 F.2d at 925 (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)). At the threshold, the prisoner must demonstrate that the disputed conduct "substantially" burdens his sincerely held religious beliefs. *See Ford v. McGinnis*, 352 F.3d 582, 587 (2d Cir. 2003). Free exercise precedents "teach that a substantial burden on religious exercise exists when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). This is not to say that protection of religious

---

[15] Concededly, an exception exists to the mootness doctrine where a claim is "capable of repetition, yet evading review," *Meyer v. Grant*, 486 U.S. 414, 417 n.2 (1988), but that exception—which generally applies "only in exceptional situations," *Dennin v. Connecticut Interscholastic Athletic Conference, Inc.*, 94 F.3d 96, 101 (2d Cir. 1996)—does not apply here. Although DOC could, in theory, continually transfer Casey to evade judicial review of his claims of retaliation, there must be a "reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party" for a case to fall into the exception. *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (quotation omitted). There is no such probability in this case, as Casey has alleged no facts from which one could conclude that DOC officials might pursue this course of conduct.

expression extends "to only those religious practices that are mandatory." *Ford*, 352 F.3d at 593.  To the contrary, the question is whether the religious practice at issue "is considered central or important to [the prisoner's] practice of [his religion]." *Id*. at 593-94.  Because "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs," *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984), "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.'" *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (quoting *LeFevre*, 745 F.2d at 157).  Despite the subjective nature of the inquiry, the substantial burden test "presupposes that there will be cases in which it comfortably could be said that a belief or practice is so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis." *Ford*, 352 F.3d at 593. The Supreme Court has supplied a further limiting principle to the notion of a substantial burden, recognizing that "[o]ne can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection . . . ." *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 715 (1981).

"Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).  Assuming a prisoner can show that his free exercise rights have been substantially burdened, the conduct of prison officials will be deemed

constitutional if it is "reasonably related to legitimate penological interests." *O'Lone*, 482 U.S. at 349 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Here, Defendants dispute that they have placed any burden—let alone a substantial one—upon Casey's religious exercise.  By Defendants' estimation, Casey has not described his religious beliefs, what practices are compelled by those beliefs, and how Defendants have curtailed his exercise of those religious practices or other acts mandated by his faith.  (Doc. 52 at 8.)  Broadly construing his *pro se* Amended Complaint, Casey appears to allege that "serving others is part of his religion" (Doc. 57 at 23), and, by limiting his association with Morales, Defendants have placed a burden upon his ability to help Morales as a spiritual advisor, contrary to the service compelled by his faith. According to the Amended Complaint, Casey was responsible for "introduc[ing]" Morales to the Christian faith.  (*Id.* at 29.)  Casey notes that their "beautiful friendship" is "at the core of their belief systems," citing bible passages that stress the importance of friendship, including the admonition that one should "love your neighbor as yourself." (*Id.*)  Particularly at the motion to dismiss stage, I do not question Casey's asserted sincerity in his religious beliefs.  Assuming, without deciding, that Casey's beliefs are sincere and Defendants have placed a substantial burden upon this aspect of Casey's exercise of his faith, I must assess whether such burdens are reasonably related to legitimate penological interests.

In *Turner*, the Supreme Court identified four factors that weigh in this balance. First, there must be a valid and rational connection between the claimed infringement and the legitimate government interest justifying it.  Second, the restriction is to be evaluated

in light of the prisoner's other available means of exercising the right.  Third, the consequences of requiring accommodation of the right on prison staff and the prison system in general should be considered.  Finally, the court should consider whether available, low-cost alternatives exist that would both accommodate the right and satisfy the penological interest at stake.  *Id.* at 89-91.  The Supreme Court applied this standard to free exercise claims in *O'Lone*, upholding a prison regulation that prevented Muslim prisoners from attending what were claimed to be mandatory religious services.[16]  In recognition of the "high level of deference" afforded prison officials, the Second Circuit "thereafter made clear that once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to 'show that these [penological] concerns were irrational.'" *Ford*, 352 F.3d at 595-96 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (noting that courts must "accord substantial deference to the professional judgment of prison administrators," and thus "[t]he burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it").

Casey claims that Defendants took a number of actions against him: removing him from his recreation and law library jobs (Doc. 57 at 23), placing him in a different living unit (*id.* at 25), placing him on fifteen minute observation checks (*id.*), and ultimately

---

[16]  Although both *Turner* and *O'Lone* concerned the reasonableness of prison regulations that limit free exercise as opposed to (as here) individualized decisions concerning particular inmates that impinge religious exercise, the Second Circuit has clarified that the analysis is the same in either circumstance.  *See Ford*, 352 F.3d at 595 n.15 (citing *Young v. Coughlin*, 866 F.2d 567 (2d Cir. 1989)).

moving him to a new facility (*id*. at 27).  The Amended Complaint makes plain the

asserted penological interest sought to be served by these steps—a desire to keep Morales

and Casey from having unsupervised time together because prison officials suspected that

Casey was engaging in a predatory sexual relationship with Morales, a particularly

susceptible target given his designation as "severely functionally impaired."  Security

within a prison facility is "perhaps the most legitimate of penological goals."  *Overton*,

539 U.S. at 133.  Indeed, "central to all other corrections goals is the institutional

consideration of internal security within the corrections facilities themselves."  *Pell v.*

*Procunier*, 417 U.S. 817, 823 (1974).  Casey, of course, denies that he posed any threat to

Morales, and I recognize that Defendants "cannot merely brandish the words 'security'

and 'safety' and expect that their actions will automatically be deemed constitutionally

permissible conduct."  *Campos v. Coughlin*, 854 F. Supp. 194, 207 (S.D.N.Y. 1994).  But

given the deference owed DOC officials in the administration of Vermont prisons, Casey

has not identified any reason why Defendants' actions might be considered wholly

irrational or untethered to the security objective sought to be fulfilled.  In fact, the

connection between the actions taken and the goal sought to be achieved appears to be

relatively tight; limiting unsupervised contact between Morales and Casey guarantees

Morales's safety from sexual predation at the hands of Casey.  No showing has been

made that "the logical connection between the regulation and the asserted goal is so

remote as to render the policy arbitrary or irrational."  *Turner*, 482 U.S. at 89-90.  Absent

such a showing, this court should not second-guess the actions taken by prison officials to

maintain prison and inmate security, as the "evaluation of penological objectives is

committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *O'Lone*, 482 U.S. at 349 (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)).  "While [I] in no way minimize the central importance of [Christianity] to [Casey], [I am] unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end."  *O'Lone*, 482 U.S. at 351-52.

Accordingly, Casey's religious liberty claims, under both RLUIPA and the Free Exercise Clause, should be DISMISSED.

### B.      Freedom of Expression Claim

In grounding his claim in the First Amendment (Doc. 57 at 33), Casey's Amended Complaint could also be construed as raising a free speech claim, as Casey alleges that Defendants acted in retaliation for his repeated filing of grievances and lawsuits.

"[T]o survive a motion to dismiss a complaint, a plaintiff asserting First Amendment retaliation claims must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action. *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quotation omitted).  In general, courts approach prisoner retaliation claims "with skepticism and particular care," because "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds* by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

As Defendants recognize (Doc. 52 at 10), the filing of prison grievances is constitutionally protected activity, *see Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988), as is the ability to access the courts and petition the government for redress of grievances, *see Colon*, 58 F.3d at 872. As Casey therefore undoubtedly (and concededly) meets the first prong of this test, I turn to the second and third prongs.

With respect to the second element, adverse action, "a plaintiff must allege that defendants subjected him to 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002) (quoting *Dawes*, 239 F.3d at 493). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes*, 239 F.3d at 493 (citing *Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999) (per curiam)). Although a prisoner does not have liberty interest in remaining at a particular facility, *see Meachum v. Fano*, 427 U.S. 215, 225 (1976), "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights." *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998); *see also Bain v. Transp. Corp. of Am.*, No. 2:07 CV 146, 2008 WL 2625234, *5 (D. Vt. June 30, 2008). Similarly, "transferring an inmate to another housing unit . . . or assigning the inmate a less desirable work assignment satisfies the adverse action requirement." *Chavis v. Struebel*, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004). That being the case, Casey has likewise met the second "adverse action" requirement.

Casey's claim is also sufficient as to the element of causation. "The causal connection must be sufficient to support the inference 'that the speech played a substantial part in the [adverse action].'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000) (quoting *Ezekwo v. NYC Health & Hosps. Corp.*, 940 F.2d 775, 780-81 (2d Cir. 1991)). The Second Circuit has held that "bald allegations of retaliation," without supporting "information [that] could have aided in establishing a plausible motivation for [retaliation] . . . and thus could have created an inference of a causal relation," are insufficient to support an inference of causality. *Dawes*, 239 F.3d at 492. But "temporal proximity of an allegedly retaliatory [adverse action] to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002). In this case, all of the allegedly retaliatory conduct took place in close temporal proximity with the filing of grievances by Morales and Casey. As Casey and Morales filed their earliest grievances, Casey's termination followed. Subsequently, as they continued to file more grievances, the alleged retaliation culminated in Casey's transfer to a different facility. This course of events—as alleged in the Amended Complaint (Doc. 57 at 20-21) and borne out by Casey's grievance documentation (Doc. 7 at 10-65)—is sufficient to create an inference of causation necessary to support a claim under the First Amendment.

Accordingly, Defendants' Motion to Dismiss Casey's First Amendment clause concerning his right to free expression should be DENIED.

### C.   Remaining Claims

As stated, Casey also grounds his § 1983 claim in the Eighth and Fourteenth Amendments to the United States Constitution.  (Doc. 57 at 33.)  Defendants have not moved to dismiss either of these claims, presumably because they were (arguably)[17] not included in the original Complaint.  Since the filing of the Amended Complaint, Defendants have opted not to attack this portion of Casey's claims by the filing of another motion to dismiss.  Accordingly, the Eighth and Fourteenth Amendment claims remain in the case.

In summary, should the court adopt this Report and Recommendation, all official capacity claims against Defendants should be DISMISSED by application of principles of sovereign immunity, all claims for injunctive relief should be DISMISSED because they have been rendered moot by Casey's transfer, and all claims under RLUIPA and the Free Exercise Clause should be DISMISSED.  If this Report and Recommendation is adopted, claims under the First (i.e., free expression), Eighth, and Fourteenth Amendments for damages against all Defendants in their individual capacities will be the only claims that remain.

## V.   Motion for Appointment of Counsel

Casey has also moved for the appointment of counsel.  (Doc. 56.)

"A party has no constitutionally guaranteed right to the assistance of counsel in a civil case."  *Leftridge v. Conn. State Trooper Officer # 1283*, 640 F.3d 62, 68 (2d Cir.

---

[17]   The original Complaint did cite a "violation of the Fourteenth Amendment of the United States Constitution" (Doc. 4 at 8), but it related only to conduct directed toward Morales, who is no longer a party to the case.

2011); *see also United States v. Coven*, 662 F.2d 162, 176 (2d Cir. 1981).  Nevertheless, a party granted *in forma pauperis* status may move the court for the appointment of an attorney if unable to afford one on their own.  *See* 28 U.S.C. § 1915(e)(1).  A court may ask an attorney to represent an indigent litigant under §1915(e)(1), but, it bears mention, Congress has not appropriated funds to pay an attorney who accepts an appointment. *Clarke v. Blais*, 473 F. Supp. 2d 124, 125 (D. Me. 2007) (Hornby, D. J.).  A court is granted "[b]road discretion" in making the decision to request that an attorney represent a litigant pro bono.  S*ee Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986).

The Second Circuit has laid out a framework for determining whether counsel should be appointed for *in forma pauperis* litigants in civil cases.  *Id*. at 61.  As a threshold requirement, a court must determine whether the indigent's claim "is likely one of substance."  *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2010) (citing *Hodge*, 802 F.2d at 61).  "[E]ven though a claim may not be characterized as frivolous, counsel should not be appointed in a case where the merits of the . . . claim are thin and [the plaintiff's] chances of prevailing are therefore poor."  *Carmona*, 243 F.3d at 632 (denying counsel where petitioner's appeal was not frivolous but nevertheless appeared to have little merit).  Once satisfied as to the substance of a plaintiff's claims, "[a] court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact[-]finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason . . . why appointment of counsel would be more likely to lead to a just determination."  *Hodge*, 802 F.2d at 61-62.

Here, the court has already granted Casey's motion to proceed *in forma pauperis*, therefore, there is little question he is unable to afford counsel on his own.  Casey brings this action under 42 U.S.C. § 1983 claiming prison officials violated a number of his constitutional rights.  (Doc. 4.)  The preceding analysis should shed light on the merits of Casey's RLUIPA and First Amendment claims.  Although I declined to recommend dismissal of Casey's free-expression claim, I do not view that claim as sufficiently meritorious as to require appointed counsel.  Further, to prevail on his Eighth Amendment claim Plaintiff will have to prove he suffered a "deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A showing of mere negligence is not enough to establish an Eighth Amendment violation, and Casey has not alleged that he was denied his multiple sclerosis medication as a result of deliberate indifference.  (Doc. 57 at 27.)  Moving on, to prevail on a Fourteenth Amendment due-process claim, a plaintiff must prove that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient procedural safeguards.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).  But the deprivations complained of— termination from prison employment and transfer from a desired unit or facility— generally do not implicate protected property or liberty interests.  *See Meachum*, 427 U.S. at 224 ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons."); *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009) (federal inmates have no protected property interests in job assignments); *Frazier v. Coughlin*, 81 F.3d 313, 318 (2d Cir. 1996) (per curiam) (prisoner

at state facility "has no protected liberty interest in a particular job assignment"); *Souliere v. Hofmann*, No. 2:08-CV-40, 2009 WL 249634, at *2-3 (D. Vt. Feb. 2, 2009).

Because I conclude that the merits of Casey's claims are "thin and his chances of prevailing are therefore poor," *Carmona*, 243 F.3d at 632, I need not cross the threshold and assess the other factors that weigh in the decision to appoint counsel. His Motion for Appointment of Counsel (Doc. 56) is DENIED.

## Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. 52) should be GRANTED in part and DENIED in part. All official capacity claims against Defendants should be DISMISSED by application of principles of sovereign immunity, all claims for injunctive relief should be DISMISSED because they have been rendered moot by Casey's transfer, and all claims under RLUIPA and the Free Exercise Clause should be DISMISSED.

Casey's Motion for Appointment of Counsel (Doc. 56) is hereby DENIED.

Dated at Burlington, in the District of Vermont, this 25th day of July, 2013.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).