UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Shane Edward Casey,

       Plaintiff,

       v.                           Civil Action No. 5:12-cv-284

Andrew Pallito et al.,

       Defendants.

## REPORT AND RECOMMENDATION
(Docs. 144, 147, 151)

Plaintiff Shane Edward Casey brings this action *pro se* under 42 U.S.C. § 1983, alleging that Defendants Andrew Pallito, Greg Hale, Dan Davies, and Kory Stone—all current or former Vermont Department of Corrections (DOC) officials—violated his rights under the First, Eighth, and Fourteenth Amendments, as well as the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA).  (*See* Doc. 57.)[1]  For relief, Casey seeks orders prohibiting DOC personnel from retaliating against him for practicing his belief in Christianity, as well as compensatory damages for lost wages, one million dollars for "und[ue] pain and suffering," and punitive and nominal damages.  (*See* Doc. 57 at 30.)

Previously in this case the court dismissed some of Casey's claims, leaving intact only his claims for money damages against Defendants in their individual capacities for

---

[1]  Casey was an inmate in the custody and control of the DOC at the time he filed his Amended Complaint.  He has since been released.  (*See* Doc. 153.)

certain alleged violations of the First, Eighth, and Fourteenth Amendments.  (*See* Docs. 58, 68, 87.)  Defendants now seek summary judgment on those remaining claims. (*See* Docs. 144, 147.)[2]  Casey opposes summary judgment.  (*See* Docs. 156; 156-13.)

Also currently pending is Casey's Motion to Amend to add claims of libel and slander.  (Doc. 151.)  Casey alleges that Defendants have defamed him in the course of this litigation by "accus[ing] both directly and by inference, that Plaintiff is a homosexual and a sexual predator."  (*Id.* at 1.)  Defendants oppose Casey's Motion to Amend. (Doc. 158.)  The court held a hearing on all of the pending Motions on August 31, 2015. For the reasons set forth below, I recommend that Defendants' Motions for Summary Judgment (Docs. 144, 147) be GRANTED, and that Casey's Motion to Amend (Doc. 151) be DENIED.

## Background

For present purposes, the following facts are undisputed except where noted.[3] Casey was an inmate in the care and custody of the DOC from January 4, 2008 until about July 9, 2015.  (*See* Doc. 57 at 1, ¶ 3; *see also* Doc. 153.)  Prior to his release, he

[2] There are two separate Motions for Summary Judgment: one filed by Assistant Attorney General Emily Carr as to all of Casey's claims (Doc. 144), and a second Motion (Doc. 147) addressing Casey's Eighth Amendment claim and filed by Attorney Sandra Strempel, who represents Defendants solely on Casey's medical claims (Doc. 138).

[3] Although there are two summary judgment Motions, I have compiled a single statement of facts for use with both Motions.  For some of their factual assertions Defendants cite portions of Casey's Amended Complaint (Doc. 57); I take those portions of the Amended Complaint as true for present purposes.  Casey has filed statements of disputed facts (*see* Docs. 156-11; 156-12), but those statements do not include citations to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56(c).  However, I have considered the materials Casey has filed, including his July 31, 2015 "Declaration" (Doc. 156), Martin Morales's November 4, 2012 affidavit (Doc. 156-3), Casey's "Addendum" (Doc. 156-13), and Casey's December 18, 2012 "Declaration" (Doc. 156-17), all of which are signed under penalty of perjury under 28 U.S.C. § 1746.

was serving two concurrent sentences of 20 years to life on two counts of aggravated sexual assault.  (*See* Doc. 57 at 1, ¶ 4.)[4]  Casey asserts that he obtained his release after successful post-conviction litigation.  (*See* Doc. 156 at 1.)[5]

Casey met inmate Martin Morales in June 2011 while they were both housed at the Chittenden Regional Correctional Facility (CRCF).  (Doc. 57 at 2, ¶ 9.)  Morales—who was born in April 1989 (*see* Doc. 156-3 at 1)—had been sexually abused when he was a child.  (Doc. 57 at 3, ¶ 12; *see also* Doc. 144-2 at 2, ¶ 7; Doc. 156-3 at 9.)  The DOC has designated Morales as seriously functionally impaired under 28 V.S.A. § 906.  (*See* Doc. 57 at 8, ¶ 33(b); Doc. 156-3 at 5.)[6]

Both Casey and Morales were transferred to the Northwest State Correctional Facility (NWSCF) in August 2011 when CRCF was converted into a women's facility.  (*See* Doc. 57 at 4, ¶ 14.)  Approximately two days after arriving at NWSCF, Casey and Morales were moved into the same unit as cellmates.  (Doc. 156-3 at 2.)  They remained cellmates for two weeks until Casey was assigned to a single-man cell in the unit.  (*Id.* at 2–3.)

---

[4]  The history of the criminal proceedings in state court is summarized in *State v. Casey*, 2013 VT 22, 193 Vt. 429, 71 A.3d 1227.

[5]  It appears that Casey obtained a judgment by consent in his state-court post-conviction-relief case, *Casey v. State of Vermont*, No. 122-1-14 Cncv.  *See* Vermont Courts Online, https://secure.vermont.gov/vtcdas/user (last visited Sept. 1, 2015) (registration required) (search for Docket Number "122-1-14 Cncv").

[6]  A "serious functional impairment" is defined, in part, as "a disorder of thought, mood, perception, orientation, or memory as diagnosed by a qualified mental health professional, which substantially impairs judgment, behavior, capacity to recognize reality . . . and which substantially impairs the ability to function within the correctional setting."  28 V.S.A. § 906(1)(A).

At NWSCF, Casey obtained a job as the assistant recreation coordinator. (Doc. 57 at 5, ¶ 19.)  Casey also worked at NWSCF as an assistant law librarian.  (*Id.*)  The NWSCF inmate handbook describes inmate employment at the facility as a "privilege," and states that "[i]nmates may be terminated from any facility job at any time for reasons including but not limited to: poor job performance, failure to follow facility rules, risks to safety and/or security, or other behavioral or attitude concerns." (Doc. 144-5 at 4.)

According to NWSCF Superintendent Greg Hale, Casey's jobs at NWSCF permitted him to have "extensive access to the various areas of the correctional facility, including all medium custody units, related hallways, the gymnasium, outside walkways and courtyards."  (Doc. 144-2 at 2, ¶ 9.)  Superintendent Hale says that Casey's job functions in those two positions were "to provide legal guidance to inmates and coordinate recreational services of the entire facility."  (*Id.* at 3, ¶ 13.)  Casey does not dispute that his duties as assistant recreation coordinator included various recreational services, including "delivering ice to the whole facility."  (*See* Doc. 156-17 at 2.) According to Hale, Casey's job functions did not include having private time with other inmates or providing spiritual advice.  (Doc. 144-2 at 3, ¶ 13.)  Hale maintains the he is "unaware of any specific requests made by either Mr. Casey or Mr. Morales to have special conditions or meeting times so that Mr. Casey could provide spiritual guidance to Mr. Morales."  (*Id.* at 3, ¶ 14.)

Defendants assert that, shortly after the transfer to NWSCF, staff began to have suspicions of an inappropriate relationship between Casey and Morales.  (Doc. 144-1

at 2, ¶ 7; Doc. 144-2 at 1–2, ¶ 5.)[7]  It is undisputed that on May 31, 2012—after an

incident that morning when Defendant Kory Stone noticed Morales cleaning Casey's

cell—staff investigated the possibility that Casey had been sexually abusing Morales.

(*See* Doc. 57 at 6–8; Doc. 144-4 at 1–2; Doc. 156 at 2, ¶ 5; Doc. 156-4; Doc. 156-3 at 4.)

It is also undisputed that the investigation did not substantiate staff's concerns.  (*See*

Doc. 144-4 at 2 (investigation was inconclusive); Doc. 156 at 2, ¶ 5.)

Casey asserts that on May 31, 2012, Morales was moved to a different unit at

NWSCF.  (Doc. 156 at 3, ¶ 7; *see also* Doc. 156-3 at 4.)  Casey also asserts that even

though the May 31, 2012 investigation was inconclusive, he was subjected to new

restrictions when he returned to work as the assistant facility recreational coordinator on

June 1, 2012.  (Doc. 156 at 3, ¶ 6; *see also* Doc. 156-3 at 8.)  Also on June 1, Morales

filed a grievance against Superintendent Hale regarding his move to a different unit.  (*See*

Doc. 156-17 at 1; Doc. 156-3 at 6.)  On June 14, 2012, Morales was transferred to the

Northern State Correctional Facility (NSCF); he was then transferred back to NWSCF on

August 24, 2012.  (Doc. 156 at 3, ¶ 6; *see also* Doc. 156-3 at 7.)

Defendants maintain that, despite the failure of the May 31, 2012 investigation to

substantiate any inappropriate relationship, staff continued to have concerns regarding the

possible predation of Morales by Casey.  Specifically, Superintendent Hale states that

mental health personnel advised him that they were concerned that Casey was having an

---

[7]  Casey disputes that staff's suspicions arose "shortly" after the transfer to NWSCF, noting that
the transfer was in August 2011, and that there was no investigation into any inappropriate relationship
until May 2012.  It is somewhat unclear whether Defendants' position is that there were "suspicions"
even before any formal investigation.  I conclude that, ultimately, any dispute as to the timing that
suspicions arose is not material for present purposes.

"undue influence" over Morales.  (Doc. 144-4 at 2; *see also* Doc. 144-2 at 2, ¶ 6.)  Mental health staff was concerned that Casey's job as assistant recreation coordinator gave him access to the whole facility, and that Casey and Morales were seen together "constantly." (Doc. 144-4 at 2.)

Hale ordered that Casey be removed from his job as assistant recreation coordinator and given a different job with less facility access.  (*Id.*; *see also* Doc. 144-2 at 2, ¶ 9.)  Casey does not dispute that he was terminated from his assistant-recreation-coordinator job on Friday, October 26, 2012.  (Doc. 156 at 3, ¶ 6; Doc. 156-17 at 2.) Casey states that on that date, without explanation, he was placed on 15-minute close-observation security checks for the weekend.  (Doc. 156-17 at 4.)  According to Casey, Hale told him on October 29, 2012 only that his termination was a "facility decision." (*Id.* at 3.)  Earlier in the day on October 26, 2012, Morales had learned that he had prevailed on an issue regarding contact with Casey in litigation in the Franklin County Superior Court.  (*See id.* at 1.)

Superintendent Hale states that mental health staff continued to advise him that Casey had an "odd and very influential hold over Morales."  (Doc. 144-4 at 2–3.)  The two men had "unlimited access to each other during rec and chow periods" and were seen together "constantly."  (*Id.* at 2; *see also* Doc. 144-2 at 3, ¶ 15.)  Mental health staff noted that "Casey fits the description of Morales[']s perpetrator in molesting him when he was a child (Older, charismatic, studying to be a pastor)."  (Doc. 144-4 at 3.)  Hale spoke to Morales about the situation on October 30, 2012, and Morales insisted that "nothing inappropriate" was going on, but also told Hale about how much he trusted Casey, looked

up to him, and how special their relationship was. (*See id.*) Morales told Hale that he believed Casey was innocent of the sexual-assault charges. (*Id.*) Hale also learned that Morales had made a video in a class where he "expressed his fondness for Casey" and sang a song he had written about Casey, Casey's innocence, and their friendship. (*Id.*)

Hale concluded that it was "unclear" what the relationship was between Casey and Morales but that "there is no question that Casey has influence over Morales." (*Id.*) Hale's opinion was that "it appears to be grooming behavior on Casey's part but at the very least it appears to be Casey taking advantage of a troubled and limited inmate and also enjoying the adoration and support of a weaker inmate." (*Id.*; *see also* Doc. 144-2 at 2, ¶ 7.) Superintendent Hale asserts that, as a result, he decided on November 2, 2012 to move Casey to a different unit "to further limit his access to Morales." (Doc. 144-4 at 3; *see also* Doc. 144-2 at 3, ¶ 15.) Hale also directed that Casey be transferred once he completed certain medical appointments. (Doc. 144-4 at 3.)

Casey does not dispute that he was moved to a different unit on November 2, 2012. (Doc. 156 at 3, ¶ 6; *see also* Doc. 156-17 at 4.) Casey says that the reason for the move was not explained to him at the time. (Doc. 156-17 at 4.) He also asserts that he was again placed on 15-minute close observation, with no expiration date, and with the only explanation being "security reasons." (*Id.*) On November 4, 2012, Casey filed a formal grievance against Hale. (*Id.*)

On November 5, 2012—after reviewing the video that Morales had made and reviewing grievances filed by Casey and Morales protesting Casey's move to a different unit—Hale met separately with Casey and Morales. (Doc. 144-2 at 3, ¶ 17; Doc. 144-4

at 4; Doc. 156-17 at 5.)  Hale states that he told Morales that he was separating Casey because he "did not trust the relationship between them" and because he was "responsible for the safety and security of the facility." (Doc. 144-4 at 4.)  Hale told Morales that his actions "were not retaliatory in any way and that he should always feel free to file grievances, complaints, or court actions as he saw fit." (*Id.*; *see also* Doc. 144-2 at 3, ¶ 17; Doc. 156 at 4, ¶ 9.)

Hale describes his meeting with Casey as "bizarre," with Casey "visibly upset and angry" and continually quoting scripture. (Doc. 144-4 at 4.)  Casey agrees that he was upset at the meeting. (Doc. 156-17 at 5.)  Casey asserts that he asked Hale why he was taking "all these arbitrary actions against me." (*Id.*)  It is undisputed that Hale replied that he was concerned about the relationship between Casey and Morales. (*Id.* at 6; *see also* Doc. 144-2 at 3, ¶ 17; Doc. 144-4 at 4–5.)  Casey insisted that his relationship with Morales was positive, and that he had helped Morales by showing him that he could be healed through Jesus. (Doc. 144-4 at 4; Doc. 156-17 at 6.)  Casey also asserted that he promoted pro-social behavior, was active in prison ministries, and that many of the men that attended church at the facility came to him for guidance and viewed him as a "spiritual authority." (Doc. 156-17 at 6; *see also* Doc. 144-4 at 4.)

Hale responded that he was bothered by the fact that Casey was viewed as an authority. (*See* Doc. 144-4 at 4; Doc. 156-17 at 6–7.)  Hale told Casey that he believed Casey was a predator and was victimizing Morales. (*See* Doc. 144-4 at 4; Doc. 157-17 at 9.)  Hale says he told Casey that he was concerned that Casey had unhealthy authority over Morales, that he did not like the relationship between the two, and that he was

breaking that relationship up.  (*See* Doc. 144-4 at 4–5; *see also* Doc. 144-2 at 3, ¶ 17;

Doc. 156-17 at 10.)  Hale informed Casey that he was removing him from the assistant

law library job because "it gave him too much access to Morales."  (Doc. 144-4 at 5; *see*

*also* Doc. 156-17 at 9–10.)

Casey does not dispute that he was terminated from the law library position on

November 5, 2012.  (Doc. 156 at 3, ¶ 6.)  Hale asserts that he told Casey that his actions

were not retaliatory and that Casey could feel free to file grievances if he objected.

(Doc. 144-2 at 3, ¶ 17.)  However, Casey insists that Hale never told him to feel free to

file grievances; according to Casey, Hale only made that statement to Morales.

(Doc. 156 at 4, ¶ 9.)  Casey wrote DOC Commissioner Andrew Pallito a letter dated

November 13, 2012, asserting that Superintendent Hale had terminated his employment

and moved him to a different unit as punishment for practicing his Christian faith.  (*See*

Doc. 156-18.)

On November 15, 2012, Superintendent Hale transferred Casey to NSCF.

(Doc. 144-2 at 3, ¶ 18; *see also* Doc. 144-3 at 1; Doc. 156 at 3, ¶ 6.)  Hale asserts that he

transferred Casey to separate him from Morales and to "ensure that Mr. Casey could not

victimize Mr. Morales."  (Doc. 144-2 at 3, ¶ 18.)  Hale maintains that he felt the transfer

was necessary because, despite having removed Casey from his positions at the

recreation center and the law library, Casey and Morales "continued to find ways to

circumvent facility rules to find time alone together."  (*Id.*; *see also id.* at 3, ¶ 15.)

In his May 26, 2015 affidavit, Superintendent Hale asserts that, while Casey was

employed as assistant law librarian and assistant recreational coordinator, he "took

advantage of his extensive access to have unauthorized contact with Mr. Morales in unauthorized areas and permitted Mr. Casey to facilitate the inappropriate relationship with Mr. Morales." (Doc. 144-2 at 2, ¶ 9.) According to Hale, the access that came with Casey's jobs "made it difficult for Department staff to monitor Mr. Casey's contact with Mr. Morales." (*Id.*) Also in that affidavit, Hale states that he "would have removed Mr. Casey from his employment for abusing his privileges, even if the inappropriate relationship did not exist between Mr. Morales and Mr. Casey." (*Id.* at 2, ¶ 10.) According to Hale:

> Mr. Casey used his position to have unauthorized contact with Mr. Morales in unauthorized areas of the facility. Unauthorized contact between inmates in unauthorized areas is a serious security concern for the Department, as it puts inmates at risk of harm and can lead to the coordination of serious, threatening security events.

(*Id.*) Hale insists that he did not transfer Casey in retaliation, but instead because Casey "presented a significant safety and security risk." (*Id.* at 4, ¶ 19.)

Casey asserts that he never abused the privileges that attended his law library and recreation jobs. He maintains that, from August 2011 until May 31, 2012 he was employed at those jobs "without any issues or complaints ever regarding my job performance." (Doc. 156 at 2, ¶ 5.) He notes that, when he was terminated from his assistant recreation coordinator job, Hale had ordered that Casey be given a different job, not that Casey be terminated from all employment for abusing job privileges. (*See* Doc. 156 at 3, ¶ 8.) According to Casey, Hale's assertions about abusing job privileges have only been articulated recently. (*See id.*) Finally, Casey asserts that, since he does not have access to materials detailing the physical layout of NWSCF, he has been unable

to prove that the areas to which he had access were all common areas or areas that were monitored. (*See* Doc. 149 at 1.)[8]

The following facts relate to Casey's Eighth Amendment claim; they are undisputed except where noted. Casey suffers from Multiple Sclerosis (MS). (Doc. 57 at 5, ¶ 22; Doc. 156-13 at 1, ¶ 1.) To treat the symptoms of the disease, he has been prescribed injections of interferon, administered three times a week on Mondays, Wednesdays, and Fridays. (*See* Doc. 156-13 at 1, ¶ 3; Doc. 156-16 at 1.) At his October 29, 2012 meeting with Casey, Superintendent Hale acknowledged that Casey has "serious health issues" and indicated that his doctor's appointments and treatments should not be disturbed. (Doc. 156-17 at 3.) Hale's awareness of Casey's health issues is reflected in his decision not to transfer Casey until after his medical appointments were completed, and that if it became necessary to move Casey earlier, it would also be necessary to bring Casey back for his appointments. (*See* Doc. 144-4 at 3.)

It is undisputed that, when Casey was transferred from NWSCF to NSCF on November 15, 2012, the medication was not transported with him and was then sent to the wrong facility. (*See* Doc. 156-13 at 1, ¶ 6; Doc. 156-16 at 1.) As a result, Casey did not receive his interferon injection on Friday, November 16, 2012. (Doc. 156-16 at 1.) The medication was overnighted from the facility to which it had been sent; Casey received his next injection that weekend. (*See id.*; *see also* Doc. 156-20 at 4 (noting interferon injection administered on November 18, 2012).)

---

[8] Earlier in this case the court denied Casey's motions seeking access to materials detailing the physical layout of NWSCF, reasoning that disclosure of those materials would put the facility's safety and security at risk. (*See* Docs. 137, 155.)

Casey and Defendants both rely on a November 28, 2012 letter from DOC Health Services Director Dr. Delores Burroughs-Biron responding to a grievance that Casey filed regarding the delayed injection.  (*See* Doc. 156-16.)  That letter states, in pertinent part:

> Fortunately, the medication is long[-]acting and as such a portion remained in your system for the time you were late receiving your shot. This is not to imply that the lapse should not have occurred and in speaking with the nursing staff it was the result of a couple of unintentional mis-steps and an emergency; 1) it was not sent with you; 2) when they attempted to send the medication it was sent to the wrong site.  Of note the nursing staff spoke with a provider who felt that a delay in medication of one day was acceptable based on the recommended dosage intervals.  The medication was over-nighted from the other site.
>
> The Department and CCS apologize for any worry this may have caused you.  The events have been reviewed and recommendations made as to how to best prevent this in the future.  The staff is also aware that you should have been notified of the problem and plans to fix it rather than your having to file a grievance.

(*Id.* at 1.)  Citing Dr. Burroughs-Biron's statement about the medication being long-acting, Defendants contend that the delay in Casey's medication did not harm him.

Casey disputes that, asserting that the missed dose caused "[f]lare-ups of M.S. symptoms" and "new symptoms . . . that [a]ffect me to [the] present day."  (Doc. 147-2 at 6.)  Casey also insists that he was harmed because missing the dose caused him "[s]evere mental and emotional distress and anguish" and posttraumatic stress disorder. (*Id.*; *see also* Doc. 156-13 at 1, ¶ 4.)  Casey highlights the portions of Dr. Burroughs-Biron's letter stating that the lapse should not have occurred, apologizing for any worry it might have caused, and that Casey should not have had to file a grievance about it.

The main source of details Casey has supplied regarding the alleged "flare-ups" and "new symptoms" that he says occurred after the delay in receiving his November 16, 2012 dose appear in medical documents that he has filed.  In a Health Service Request dated November 17, 2012, Casey complained of an unsteady gait, headaches, knee and neck pain, fatigue, and difficulty sleeping, but he described each of those issues as preexisting.  (*See* Doc. 156-20 at 4.)  On November 19, 2012, Casey filed another Health Services Request noting the following:  "Symptoms starting on 11.18.12 of legs cramping up feels like muscles constricting tightening up, pain in left foot, . . . [f]eels like I am on a boat rocking[.]  Standing up or sitting down unsteady feeling.  Headaches.  Muscle spasms left tricep; bicep.  Notify neurologist ASAP."  (*Id.* at 5.)

In another request dated November 20, 2012, Casey stated that he was experiencing "new symptoms & difficulty" and that it was "incredibly worrisome." (*Id.* at 6.)  In a November 22, 2012 request, Casey wrote: "My equilibrium feels off more today.  Numbing in right arm.  Pain in right elbow and knees.  I am in an exasperation.  Need to contact neurologists.  I fear condition worsening.  This has been [ongoing] since end of October and progressively gotten worse.  Vertigo."  (*Id.* at 7.)  In a request dated November 25, 2012, Casey described the night before as "one of the wors[t] nights, pain wise."  (*Id.* at 8.)  A provider note regarding a November 26, 2012 examination indicated that the degree of control of Casey's MS was "[f]air" and that his clinical status was "[w]orsening."  (Doc. 156-23 at 1.)  In additional Health Services Requests dated December 3, December 4, and December 14, 2012, Casey described symptoms of pain, dizziness, unsteady gait, fatigue, and headaches.  (Doc. 156-20 at 9–11.)  In a request

dated January 24, 2013, Casey wrote: "Feeling an attack of MS being active.  Symptoms getting worse and not lessening."  (*Id.* at 12.)

According to Superintendent Hale, he is "not involved in the transfer of medication when an inmate is transferred to a different facility."  (Doc. 144-2 at 4, ¶ 20.) Hale asserts that the DOC's medical contractor "manages transfer of medication and is responsible for clearing any inmate who is leaving the facility."  (*Id.*)  Casey maintains that, under the DOC's Policy 351 (regarding health care services), facility superintendents are responsible for assuring that "procedural directives are developed and followed for the delivery of medical services," including "Transfer Medications," "Training Employees in Medication Distribution," and "Medical and Emergency Training of Non-Medical Staff."  (Doc. 156-15 at 4–6.)

In addition to his claim about the missed interferon injection, Casey claims that "all of [Defendants'] actions" (presumably those actions that are the subject of Casey's First and Fourteenth Amendment claims) caused him "undue, chronic stress" and exacerbated his MS symptoms.  (*See* Doc. 156-13 at 1, ¶¶ 4, 6.)  He has filed copies of several Mental Health Progress Notes from appointments on October 5, 2012, December 17, 2012, January 3, 2013, January 24, 2013, February 5, 2013, and February 18, 2013.  (Doc. 156-26.)  Those notes document Casey's reports of stress and frustration with being transferred from NWSCF, his medical issues, and his belief that he was wrongfully convicted.

## **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(a), a court must grant summary

judgment "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  In determining whether there

is a genuine issue of material fact, the court is "'required to resolve all ambiguities and

draw all factual inferences in favor of the' nonmovant."  *Robinson v. Concentra Health

Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Nationwide Life Ins. Co. v. Bankers

Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999)).  "'Where the moving party

demonstrates the absence of a genuine issue of material fact, the opposing party must

come forward with specific evidence demonstrating the existence of a genuine dispute of

material fact.'"  *Id.* (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).

"'More specifically, it must do more than simply show that there is some metaphysical

doubt as to the material facts, and may not rely on conclusory allegations or

unsubstantiated speculation.'"  *Id.* (quoting *Brown*, 654 F.3d at 358).

## **Analysis**

### I.    **First Amendment Claims**

Casey advances two First Amendment claims: a free-exercise claim alleging

various actions against him for practicing his faith by counseling and advising fellow

inmate Martin Morales, and a freedom-of-expression claim alleging retaliation against

him for filing grievances.  The court has previously dismissed all portions of Casey's

free-exercise claim except for those related to the termination of his employment.

(Doc. 68 at 12.)  As the court observed previously, separating Casey and Morales was

15

"clearly related to Defendants' penological interest in discouraging sexual predation," but it was less clear "that all of Plaintiff's employment needed to be terminated to achieve this same end." (*Id.*) I therefore address Casey's freedom-of-expression claim and the remaining portion of his free-exercise claim.

### A.      Free Exercise—Termination from Employment

The court previously recited the legal standards for a prisoner's free-exercise claim. (*See Id.* at 8–9.) First, a prisoner bringing such a claim "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006); *but cf. O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (applying "'reasonableness' test" to prisoner free exercise-claims (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 127–28 (1977))). As the court previously noted, the Second Circuit has applied the "substantial burden" standard without actually adopting or endorsing that test. *See Salahuddin*, at 274 n.3 ("We do not decide today what effect the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), has on the *O'Lone* standards for judging prisoner free-exercise claims because neither party argues that *Smith* changes the analysis.").[9]

Here, as in *Salahuddin*, it is unnecessary to decide the fate of the "substantial burden" standard. At the motion-to-dismiss stage, the court concluded that Casey had

---

[9] In a recent case, the Supreme Court recounted the evolution of the law in this area, noting that the *Smith* case "largely repudiated" the "substantial burden" standard, and further describing Congress's responses to *Smith* and other Supreme Court decisions, culminating in RLUIPA. *Holt v. Hobbs*, 135 S. Ct. 853, 859–60 (2015).

sufficiently alleged that: (1) his religious beliefs are sincerely held; (2) the practice of counseling others (like Morales) is central or important to his faith; and (3) Defendants' conduct—such as terminating his employment—substantially burdens Casey's sincerely held religious beliefs by limiting his contact with Morales.  (Doc. 68 at 10.)  On summary judgment, Defendants do not challenge the "substantial burden" standard or the court's earlier determinations of those issues in the motion-to-dismiss context.

Rather, Defendants focus on the examination into whether the burden on Casey's religious beliefs was reasonably related to legitimate penological interests.  *See Salahuddin*, 467 F.3d at 274.

> Courts must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Id.* (footnote omitted) (citing *Turner v. Safley*, 482 U.S. 78, 90–91 (1987)).  Casey bears the burden of showing that Defendants' articulated concerns were irrational.  *Id.* at 275.

Defendants maintain that there was a "reasonably legitimate penological interest in terminating Plaintiff from his prison jobs."  (Doc. 144 at 8.)  Specifically, Defendants argue that the penological interest was Morales's safety and security, as well as the safety and security of the entire facility.  (*Id.* at 9.)  They contend that Casey was using his job privileges to have unauthorized contact with Morales, that Casey abused those privileges

by meeting with Morales at unauthorized times, and that the places Casey had access to within NWSCF made it difficult for staff to monitor his contact with Morales.  (*Id.* at 8.)

As the court previously concluded, separating Casey and Morales so that they could no longer have contact is clearly related to Defendants' penological interest in discouraging sexual predation.  (Doc. 68 at 12.)  Here, it is undisputed that Casey's job as the assistant recreation coordinator gave him access to numerous areas of the NWSCF facility.  That access gave Casey opportunities to have contact with Morales; it also made it more difficult for staff to monitor that contact.  Casey's job at the law library likewise created opportunities for him to have contact with Morales.  The government has therefore met its burden of identifying the legitimate penological interests that justify Casey's termination.[10]

The court previously observed that Casey appeared to be arguing that terminating him from his employment was irrational because Defendants had other means of monitoring his contact with Morales and because Defendants had the ability and resources to accommodate his burdened right.  (Doc. 58 at 11.)  Casey has not presented any facts, however, that might support such arguments.  He does not articulate, for example, how, if he kept his jobs and the access that came with them, NWSCF staff could have monitored his contact with Morales without difficulty or any material adverse

---

[10]  It is unnecessary to decide here whether Casey ever sexually abused Morales.  It is also unnecessary to decide whether Casey was ever in an unauthorized area of NWSCF at any unauthorized time, whether he failed to follow the rules that pertained to his employment, or whether he ever presented a threat to the safety or security of the entire facility.  To the extent that there is any dispute on those issues, they are not material to the resolution of the pending summary judgment Motions.  Thus, even though materials detailing the physical layout of NWSCF might be unavailable to Casey, the facts that those materials might reveal are not material for present purposes.

impact on resources.  He presents no facts suggesting that he might have been able to continue performing his job functions without the facility access that gave him opportunities to have contact with Morales.  Accordingly, I conclude that Casey has not met his burden of showing that the concern about his employment at NWSCF as facilitating contact with Morales was irrational.

### B.    Freedom of Expression—Retaliation

As the court previously recognized, Casey's Amended Complaint—liberally construed—includes a First Amendment claim that Defendants retaliated against him for filing grievances and lawsuits.  (*See* Doc. 58 at 29; *see also* Doc. 57 at 20, ¶ 79; Doc. 57 at 27 ¶ 102.)  "Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'"  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).  "[A] defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory

action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287–88 (2d Cir. 2003). "Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action.  The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." *Id.* at 288.

Here, the court previously concluded at the motion-to-dismiss stage that Casey's allegations, if taken as true, were sufficient to survive Defendants' Rule 12(b)(6) motion as to each of the three elements of retaliation.  (Doc. 58 at 30–31.)  Specifically, the court concluded that accessing the courts and filing grievances is protected.  (*Id.* at 30.)  The court also concluded that Casey had alleged "adverse action" because he was transferred and because he was terminated.  (*Id.*)  Finally, the court concluded that Casey had sufficiently alleged a "causal connection" because the alleged retaliatory conduct "took place in close temporal proximity with the filing of grievances by Morales and Casey." (*Id.* at 31.)

At the summary judgment stage, Defendants contend that Casey cannot prove that his employment termination and transfer were "motivated by his filing grievances" because, they say, DOC took those actions "for reasons unrelated to filing grievances." (Doc. 144 at 7.)  Namely, Defendants maintain that Casey was terminated from employment and transferred out of a desire "to protect Morales from being victimized by [Casey's] predatory sexual behavior."  (*Id.*)  Indeed, Superintendent Hale states in his Rule 56 affidavit that he did not terminate Casey in retaliation for filing grievances. (Doc. 144-2 at 3, ¶ 12.)  Hale states that his reasons for terminating Casey "were that Mr. Casey was abusing his privileges and threatening the safety and security of the institution

and, specifically, that Mr. Morales was at risk of harm." (*Id.*) Similarly, Hale maintains that he did not transfer Casey in retaliation, but that he transferred him "because he presented a significant safety and security risk." (*Id.* at 4, ¶ 19.)

"A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal*, 558 F.3d at 129. As the court previously recognized in this case, "all of the allegedly retaliatory conduct took place in close temporal proximity with the filing of grievances by Morales and Casey." (Doc. 58 at 31.) However, to the extent that the temporal proximity satisfies Casey's initial burden of showing that an improper motive played a substantial part in defendant's action, Defendants have shown that Casey would have been terminated and transferred even if he had not filed any grievances. Namely, there is ample evidence that those actions were taken because of the concerns that Casey might be grooming or preying upon Morales. Defendants are accordingly entitled to summary judgment on Casey's First Amendment retaliation claim.

## II.     Fourteenth Amendment Claim

In his Amended Complaint, Casey alleges that his termination from employment and his transfer to NSCF violated his rights under the Fourteenth Amendment. (*See* Doc. 57 at 21, 33.) On summary judgment, Defendants assert that Casey has failed to state any Fourteenth Amendment claim because he does not possess any liberty interest in his prison employment or in being housed in a particular facility. (Doc. 144 at 10.) In his Opposition, Casey states: "I never claimed I have a right to a job, what unit or cell [I]

live in, or what facility I am housed in or transferred to." (Doc. 156 at 4, ¶ 10.) But Casey maintains that he does claim a right to be free from retaliation. (*See id.*)

"[P]risoners lawfully deprived of their freedom retain substantive liberty interests under the Fourteenth Amendment." *McKithen v. Brown*, 481 F.3d 89, 106 (2d Cir. 2007). However, as Casey concedes, "[a] prisoner has no liberty interest in remaining at a particular correctional facility . . . ." *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998). Neither do prisoners have any protected liberty interest in a particular job assignment. *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009) (per curiam). Of course, "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights . . . ." *Davis*, 160 F.3d at 920. Neither does the Constitution tolerate termination from prison employment in retaliation for the exercise of such rights. *See Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987). However, Casey's retaliation claims are discussed above; for the reasons stated, Defendants are entitled to summary judgment on those claims.

At the August 31, 2015 hearing, Casey suggested that his due process rights were violated because adverse actions were taken against him without—at least initially—advising him as to the reason for those actions. He was, without explanation, subjected to additional restrictions at his job in early June 2012, terminated from his assistant-recreation-coordinator job in late October 2012, and moved to a different unit in early November 2012. However, Casey cites no authority for the proposition that he had a due

process right to any explanation for those actions.[11]  Rather, since Casey had no liberty

interest in remaining at any particular correctional facility or job assignment, due process

did not require that any reason be given for those actions.

### III.   Eighth Amendment Claims

Casey claims that his Eighth Amendment rights were violated when his interferon

injection was delayed.  (*See* Doc. 57 at 27, ¶ 102a.)  As stated above, he also claims that

"all of [Defendants'] actions" caused him "undue, chronic stress" and exacerbated his

MS symptoms.  (*See* Doc. 156-13 at 1, ¶¶ 4, 6.)  I begin with a brief overview of the

Eighth Amendment, which "forbids 'deliberate indifference to serious medical needs of

prisoners.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir.

2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

"[T]he deliberate indifference standard embodies both an objective and a

subjective prong."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  "The

objective component requires that 'the alleged deprivation must be sufficiently serious, in

the sense that a condition of urgency, one that may produce death, degeneration, or

extreme pain.'"  *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v.

Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)); *see Nance v. Kelly*, 912 F.2d 605, 607–08

(2d Cir. 1990) (per curiam) (comparing conditions that were objectively sufficiently

serious (e.g., brain tumor or broken pins in a hip) with those that were not (e.g., sore feet,

a kidney stone, headache, toothache)).  The Second Circuit has recognized that "acts

---

[11]  The NWSCF Handbook does not create any right to an explanation for termination.  The
Handbook lists a nonexclusive set of reasons for termination, but imposes no requirement that the
terminated inmate receive any explanation.  (*See* Doc. 144-5 at 4.)

causing mental suffering can even absent attendant bodily pain violate the Eighth Amendment."  *United States ex rel. Schuster v. Vincent*, 524 F.2d 153, 160 (2d Cir. 1975); *see also Spavone*, 719 F.3d at 138 (serious medical needs include needs for mental health care); *Shenk v. Cattaraugus Cnty.*, 305 F. App'x 751, 754 (2d Cir. 2009) ("We have never held that mental anxiety is a serious medical need, but the condition appears to satisfy at least two of the *Chance* factors, anxiety being a condition that a doctor would find important, and which can affect one's daily activities." (referring to *Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998))).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care," meaning that they acted or failed to act "'while *actually aware* of a substantial risk that serious inmate harm will result.'"  *Spavone*, 719 F.3d at 138 (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)).  That mental state exists when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Hathaway*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  "[T]he subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"  *Id.* (first alteration added) (quoting *Farmer*, 511 U.S. at 835).

Defendants argue that Casey cannot satisfy either prong of the Eighth Amendment deliberate-indifference standard.  (Doc. 147 at 4–7.)[12]  I discuss each prong with respect to Casey's claim about the delayed interferon injection.  I then address Casey's more general claim that all of Defendants' actions caused him undue stress and exacerbated his MS symptoms.

### A.    Delayed Interferon Injection

#### 1.    Objective Prong

As other courts have recognized, multiple sclerosis is a serious medical condition. *See Hart v. City of New York*, No. 11 Civ. 4678(RA), 2013 WL 6139648, at *7 n.5 (S.D.N.Y. Nov. 18, 2013).  However, where the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, "it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone" in performing the objective analysis.  *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003).  It is therefore necessary to evaluate the effects of the one-time delay in Casey's interferon medication to determine whether it was sufficiently serious.

Here, Defendants maintain that, due to the long-acting nature of the medication, he was not harmed by the one-time delay in receiving his medication.  (*See* Doc. 147-1 at 2; Doc. 70-1 at 1.)  In contrast, Casey asserts that the delayed dose caused "[f]lare-ups of

---

[12]  Defendants also appear to argue that Superintendent Hale was not responsible under DOC Policy 351 (Doc. 156-15) for the proper transfer of Casey's medication when Casey was transferred from NWSCF to NSCF.  It is unnecessary to reach that argument because, even assuming that Policy 351 did impose such a responsibility upon Hale, Casey cannot prove deliberate indifference for the reasons discussed below.

M.S. symptoms" and "new symptoms . . . that [a]ffect me to [the] present day."  (Doc. 147-2 at 6.)  It appears from the Health Service Requests that Casey filed in the days and weeks immediately after the delayed injection that Casey did report symptoms including pain, dizziness, unsteady gait, fatigue, and headaches.  However, Casey's filings do not make it clear to what extent those symptoms might have been preexisting or caused by circumstances other than the delayed injection.  Moreover, even giving Casey the benefit of all reasonable inferences, I conclude that he has not shown that any exacerbated or new MS symptoms that might have been caused by the one-time delayed injection were so serious as to implicate the Eighth Amendment.

Casey also claims that missing the dose caused him "[s]evere mental and emotional distress and anguish" and posttraumatic stress disorder.  (*Id*.)  As noted above, acts causing mental suffering can violate the Eighth Amendment in some cases.  But Casey has not elaborated on his alleged mental suffering resulting from the delayed injection.  The Mental Health Progress Notes he cites (Doc. 156-26) do recount some of Casey's emotions regarding his physical health, but there is no specific mention of any particular distress arising out of the delay in the interferon injection.  I conclude that Casey has not supplied sufficient evidence to establish that any mental or emotional distress related to the one-time delay in his MS medication was sufficiently serious for Eighth Amendment purposes.

### 2.    Subjective Prong

Even if Casey could establish the objective prong, I conclude that he cannot establish the subjective prong of the deliberate-indifference test.  As the subjective

26

"reckless" standard implies, a plaintiff "must show that the defendant acted with 'more than mere negligence.'" *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Farmer*, 511 U.S. at 835). Defendants maintain that Casey has failed to present evidence that anything more than a mistake caused the delay. (Doc. 147 at 6.) Casey's position is that Defendants harbored "bad motives or attitudes." (Doc. 156-12.)

Casey points to the portions of Dr. Burroughs-Biron's November 28, 2012 letter where she states that the delay "should not have occurred" and that the DOC "apologize[s] for any worry this may have caused you." (Doc. 156-16 at 1.) I conclude that nothing about those statements proves that the delay was the result of subjective recklessness on the part of any Defendant. The fact that Dr. Burroughs-Biron apologized for the delayed injection does not prove that the delay was the result of deliberate indifference. Indeed, in the same letter, Dr. Burroughs-Biron attributes the delay to "a couple of unintentional mis-steps and an emergency." (*Id.*) Casey has not presented any evidence to the contrary.[13]

At the August 31, 2015 hearing, Casey suggested that the mere act of transferring him was an act of deliberate indifference. Casey points out that Superintendent Hale had previously remarked that there was no need to "disturb" Casey's treatment by transferring him. (*See* Doc. 156-17 at 3.) But that statement does not prove that Hale knew that transferring Casey would result in a delay in Casey's injection. Moreover, other evidence

---

[13] Casey appears to suggest that Dr. Burroughs-Biron's reference to an "emergency" establishes deliberate indifference. But Casey does not say what the emergency was. Moreover, if an emergency was part of the cause of the delay, that would actually undermine Casey's claim of deliberate indifference, suggesting that staff did not cause the delay because of reckless indifference to Casey's needs, but because another pressing matter demanded their attention.

in the record suggests that, at the same time he was contemplating Casey's transfer, Hale was cognizant of Casey's medical condition and taking steps to ensure he would receive proper treatment. (*See* Doc. 144-4 at 3 (directing that transfer occur only after Casey completed medical appoints).)  Because Casey has presented no evidence that the delayed injection was the result of anything other than a mistake, I conclude that he has failed to demonstrate a triable issue of fact on the subjective prong.

### B.     "Undue Stress" From the Events at NWSCF Regarding Morales

Apart from his claim regarding the delayed interferon injection, Casey asserts that that "all of [Defendants'] actions" caused him "undue, chronic stress" and exacerbated his MS symptoms. (*See* Doc. 156-13 at 1, ¶¶ 4, 6.)  In support, Casey cites certain documents for the proposition that chronic stress increases the risk for MS exacerbations. (*See* Doc. 156-14 at 16, 18.)

Here, assuming that the events at NWSCF discussed above caused Casey stress or anxiety, and assuming—as the Second Circuit did in *Shenk*, 305 F. App'x at 754—that anxiety is a serious medical need, I nevertheless conclude that Casey cannot show Defendants were subjectively deliberately indifferent to that need.  As discussed above, Casey was terminated from his employment and transferred, at least in part, for safety and security reasons.  There is some evidence that Superintendent Hale might have been aware that his actions were causing Casey stress or anxiety. (*See* Doc. 144-4 at 4 (recognizing that Casey was upset and angry at the November 5, 2012 meeting).)  But Casey has presented no evidence that any Defendant knew that their actions might cause "chronic" stress or MS exacerbations.

28

And even if Casey had warned Defendants that stress might cause him to experience MS exacerbations, Defendants could not reasonably have disregarded their obligations to maintain prison safety and security. A certain amount of stress or anxiety is unavoidable in the prison context. *See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999) ("Depression and anxiety are unfortunate concomitants of incarceration . . . ."). Some administrative decisions by prison staff can undoubtedly cause stress to inmates. But that does not mean that prison staff must avoid making such decisions that might impact inmates with MS. A contrary rule would hobble prison administrators and prevent them from carrying out their responsibilities.

Finally, to the extent that Casey was subjected to unavoidable stress in the course of his job terminations and transfer, he has presented no evidence that any Defendant denied mental health services to help him cope. Indeed, Casey's own filings indicate that mental health services were available to him, that he knew how to access those services, and that he met with mental health staff on multiple occasions during the time period at issue. (*See* Doc. 156-26.) For all these reasons, I conclude that Casey cannot establish deliberate indifference on his "undue stress" claim.

## IV.   Motion to Amend

As noted above, Casey has filed a Motion to Amend to add state-law claims of libel and slander against Defendants. (*See* Doc. 151.) He alleges that Defendants have defamed him in the course of this litigation by "accus[ing] both directly and by inference, that Plaintiff is a homosexual and a sexual predator." (*Id.* at 1.) Defendants oppose

Casey's Motion, arguing that it is untimely, filed in bad faith, prejudicial, and futile. (Doc. 158 at 3–4.)

Under Rule 15(a) of the Federal Rules of Civil Procedure, once the time for amending a pleading as of right has expired, a party may request leave of the court to amend, which "[t]he court should freely give when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

Casey's proposed amendment should be denied as futile.[14] If the court adopts this Report and Recommendation, all of Casey's federal claims will be rejected. In the absence of a viable federal claim, the court should decline—under 28 U.S.C. § 1367(c)(3)—to exercise supplemental jurisdiction over Casey's proposed state-law defamation claim. Thus it would be futile to permit the proposed amendment. *See Wilson v. New York City Dep't of Corr.*, No. 11 Civ. 9157(PAE), 2013 WL 922824, at *5 (S.D.N.Y. Mar. 8, 2013) (denying leave to amend to add new state-law claims because plaintiff had failed to state any federal claim); *Briscoe v. City of New Haven*, No. 3:09-cv-1642(CSH), 2010 WL 2794212, at *11 (D. Conn. July 12, 2010) (futile to permit

---

[14]  It is therefore unnecessary to address Defendants' arguments that it is untimely, filed in bad faith, and prejudicial.

amendment where court would decline to exercise supplemental jurisdiction under

28 U.S.C. § 1367), *rev'd on other grounds*, 654 F.3d 200 (2d Cir. 2011).[15]

Even if the court concluded that it was proper to exercise supplemental jurisdiction

over Casey's proposed state-law-defamation claim, the claim would likely face a high

hurdle in the form of the affirmative defense of absolute immunity.  Here, Casey asserts

that the defamatory statements "were made in filings to this court."  (Doc. 151 at 1.)  That

is problematic for Casey's claim because Vermont recognizes absolute privileges as

defenses to defamation claims.  *See O'Connor v. Donovan*, 2012 VT 27, ¶ 26, 191 Vt.

412, 48 A.3d 584 (citing Restatement (Second) of Torts § 588) (absolute privilege for

witnesses in judicial proceedings).  According to the Restatement, "[a] party to a private

litigation . . . is absolutely privileged to publish defamatory matter concerning another in

communications . . . during the course and as part of, a judicial proceeding in which he

participates, if the matter has some relation to the proceeding."  Restatement (Second) of

Torts § 587; *see also* D. Dobbs et al., *Prosser & Keeton on Torts* 817 (5th ed. 1984)

(absolute privilege against defamation extends to the parties to private litigation, and

"covers anything that may be said in relation to the matter at issue, whether it be in the

pleadings, in affidavits, or in open court" (footnotes omitted)).

---

[15] Defendants argue that the Vermont Tort Claims Act (VTCA) requires lawsuits resulting from state employee torts to be brought solely against the State of Vermont and exclusively in Vermont superior courts.  (*See* Doc. 158 at 6.)  I do not rely on the VTCA because it is unclear whether Defendants' alleged defamatory statements made in the course of defending themselves in this litigation is conduct "within the scope of [their] employment" as required by 12 V.S.A. § 5602(a).

## Conclusion

For the reasons stated above, I recommend that Defendants' Motions for Summary Judgment (Docs. 144, 147) be GRANTED, and that Casey's Motion to Amend (Doc. 151) be DENIED.

Dated at Burlington, in the District of Vermont, this 22nd day of September, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).