U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2016 JAN -7  PM 4: 19

CLERK

BY_____
DEPUTY CLERK

SHANE EDWARD CASEY,              )
                                 )
        Plaintiff,               )
                                 )
    v.                           )     Case No. 5:12-cv-284
                                 )
ANDREW PALLITO et al.,           )
                                 )
        Defendants.              )

## OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Docs. 144, 147, 151, 161)

This matter came before the court for a *de novo* review of the Magistrate Judge's September 22, 2015 Report and Recommendation ("R & R") (Doc. 161). The Magistrate Judge recommended that the court grant the motions for summary judgment filed by Defendants Andrew Pallito, Greg Hale, Dan Davies, and Kory Stone (collectively, "Defendants") (Docs. 144, 147), and deny the motion to amend filed by Plaintiff Shane Edward Casey (Doc. 151). Plaintiff has timely objected to the R & R, arguing that the R & R's conclusions of law are not supported by the evidence. Defendants oppose Plaintiff's objections.

Plaintiff is self-represented. Defendants are represented by Emily A. Carr, Esq., Katherine Amestoy Martin, Esq., and Sandra A. Strempel, Esq.

**I.    Factual Background.**

The court relies upon the facts as set forth in the R & R with the exception of the disputed facts identified herein.

Plaintiff was incarcerated at facilities operated by the Vermont Department of Corrections (DOC) from January 4, 2008 until on or about July 9, 2015. Prior to his release, he was serving two concurrent sentences of twenty-years to life for two aggravated sexual assaults. Defendants are current or former DOC officials.

## A.    Plaintiff's Relationship with Inmate Morales.

In June 2011, Plaintiff met fellow inmate Martin Morales while they were housed at the Chittenden Regional Correctional Facility.  Mr. Morales had been sexually abused as a child and DOC had designated him as "seriously functionally impaired."  *See* 28 V.S.A. § 906 (defining "'[s]erious functional impairment'" as "a disorder of thought, mood, perception, orientation, or memory as diagnosed by a qualified mental health professional, which substantially impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life and which substantially impairs the ability to function within the correctional setting").

In August 2011, Plaintiff and Mr. Morales were transferred to the Northwest State Correctional Facility ("NWSCF") when the Chittenden Regional Correctional Facility was converted into a women's facility.  Approximately two days after their transfer to NWSCF, Plaintiff and Mr. Morales were assigned to share a cell.  They remained cellmates for two weeks, at which time Plaintiff was assigned to a single-person cell in the same unit.  At some point after their transfer to NWSCF, "staff began to suspect an inappropriate relationship between Mr. Morales and [Plaintiff]."  (Doc. 144-2 at 1-2, ¶ 5.)[1]

At NWSCF, Plaintiff obtained employment as an assistant recreation coordinator and as an assistant law librarian.  The NWSCF handbook describes inmate employment as a "privilege[,]" which may be "terminated . . . at any time for reasons including but not limited to[] . . . failure to follow facility rules, risks to safety and/or security, or other behavioral or attitude concerns."  (Doc. 144-5 at 4.)  Plaintiff's jobs provided "extensive access to the various areas of the correctional facility, including all medium custody units, related hallways, the gymnasium, outside walkways[,] and courtyards[.]"  (Doc. 144-2 at 2, ¶ 9.)

---

[1] The parties dispute when such suspicions arose.  In his Objection to the R & R, Plaintiff argues that an investigation into his relationship with Mr. Morales did not occur until more than a year after his arrival at NWSCF.  Because Plaintiff's claims arise out of the alleged adverse actions he suffered after DOC's suspicions arose, the timing of the staff's initial suspicions is not material to the pending objections.

2

According to Defendant Hale, Plaintiff "took advantage of his extensive access to have unauthorized contact with Mr. Morales in unauthorized areas" and such extensive access thereby "permitted [Plaintiff] to facilitate the inappropriate relationship with Mr. Morales." *Id.* Plaintiff's expanded access to the facility also "made it difficult for [DOC] staff to monitor [Plaintiff's] contact with Mr. Morales." *Id.* Such "[u]nauthorized contact between inmates is a serious security concern for the [DOC], as it puts inmates at risk of harm and can lead to the coordination of serious, threatening security events." *Id.* at 2, ¶ 10.

Plaintiff maintains that Defendants were not concerned that Plaintiff was abusing his employment privileges to further an inappropriate relationship with Mr. Morales, and that Defendants fabricated such concern to retaliate against him. He notes that "[f]rom August 2011 until May 31[], 2012, [he] was employed as the assistant facility rec-coordinator and the assistant law librarian without any issues or complaints ever regarding [his] job performance." (Doc. 156 at 2, ¶ 5.)

On May 31, 2012, Defendant Kory Stone found Mr. Morales cleaning Plaintiff's cell, and DOC staff investigated whether Plaintiff had been sexually abusing Mr. Morales. This investigation produced "inconclusive" results. (Doc. 144-4 at 2.) Thereafter, Mr. Morales was moved to a different unit at NWSCF.

On June 1, 2012, Mr. Morales filed a grievance against Defendant Hale, challenging his transfer to a different unit. On this same day, additional restrictions were imposed on Plaintiff in his work as the assistant recreation coordinator.

On June 14, 2012, Mr. Morales was transferred to the Northern State Correctional Facility ("NSCF"). On August 24, 2012, he was transferred back to NWSCF. On Friday, October 26, 2012, Mr. Morales learned that he had prevailed on an issue regarding contact with Plaintiff in a case that was pending before the Franklin County Superior Court. *See* Doc. 156-17 at 1 (Plaintiff describing a conversation that he had with Mr. Morales on October 26, 2012, wherein Mr. Morales stated that "'[he] was just informe[d] by the Franklin Superior Court that some of the Rule 65's [he] filed in the civil division were grante[d] in [his] favor and one of them was regarding contact with [Plaintiff[]]'").

3

On that same day, Plaintiff was terminated from his employment as an assistant recreation coordinator. Defendant Hale avers that "[w]hile [he] was very concerned about the potential predation of [Plaintiff] toward Mr. Morales, [he] would have removed [Plaintiff] from his employment for abusing his privileges, even if the inappropriate relationship did not exist between Mr. Morales and [Plaintiff]." (Doc. 144-2 at 2, ¶ 10.) Plaintiff was also placed on fifteen-minute close-observation security checks for the weekend.

After his employment termination, Plaintiff no longer had expanded access to the facility, but he and Mr. Morales still had "unlimited access to each other during rec[reational] and chow periods." (Doc. 144-4 at 2.) Staff continued to be concerned that Mr. Morales was subject to Plaintiff's predation, although Plaintiff disputes whether such concern was genuinely held. Mental health personnel at NWSCF advised Defendant Hale of their observation that Plaintiff had an "odd and very influential hold over [Mr.] Morales." *Id.* at 3. They also noted that Plaintiff "fits the description of [Mr.] Morales['s] perpetrator in molesting him when he was a child ([o]lder, charismatic, studying to be a pastor)." *Id.*

On October 30, 2012, Defendant Hale and Mr. Morales discussed the nature of his relationship with Plaintiff. Mr. Morales insisted that "nothing inappropriate [was] going on but then w[e]nt on to tell [Defendant Hale] how much he trusts [Plaintiff], looks up to him, and how special their relationship is." *Id.* Defendant Hale also discovered that Mr. Morales had made a video in which he "expressed his fondness" for Plaintiff and sang a song about Plaintiff's "innocence and their friendship." *Id.* Defendant Hale concluded that the nature of their relationship was "unclear[,]" but that "there is no question that [Plaintiff] has influence over [Mr.] Morales." *Id.* Additionally, he noted that "it appears to be grooming behavior on [Plaintiff's] part but at the very least it appears to be [Plaintiff] taking advantage of a troubled and limited inmate and also enjoying the adoration and support of a weaker inmate." *Id.*

On November 2, 2012, Plaintiff was moved to a different unit. Plaintiff was placed indefinitely on fifteen-minute close-observation checks for "security reasons[.]"

4

(Doc. 156-17 at 4.)  On November 4, 2012, Plaintiff filed a grievance against Defendant Hale.

On November 5, 2012, Defendant Hale reviewed the video that Mr. Morales had created. He also reviewed the grievances, filed by both Plaintiff and Mr. Morales, protesting Plaintiff's move to a different unit. After reviewing these materials, Defendant Hale met with Plaintiff and Mr. Morales separately. In his meeting with Mr. Morales, Defendant Hale advised that he had moved Plaintiff because he "did not trust the relationship between [Plaintiff and Mr. Morales] and [] was responsible for the safety and security of the facility." (Doc. 144-4 at 4.)  Defendant Hale "was also clear that [his] actions were not retaliatory in any way and that he should always feel free to file grievances, complaints, or court actions as he saw fit."  *Id.*  In his discussion with Plaintiff, Defendant Hale explained that he was separating him from Mr. Morales because he was concerned about their relationship.  Plaintiff insisted that his relationship with Mr. Morales was "positive and appropriate."  *Id.*  Plaintiff also noted that he had advised Mr. Morales spiritually, and that many men came to him for guidance and viewed him as a "spiritual leader[.]"  *Id.*  It is disputed whether Defendant Hale advised Plaintiff that he should feel free to file grievances, complaints, or court actions.

During his meeting with Plaintiff, Defendant Hale terminated Plaintiff's employment as an assistant law librarian because "it gave him too much access to [Mr.] Morales."  *Id.* at 5.  On November 13, 2012, Plaintiff wrote Defendant Pallito a letter, asserting that Defendant Hale had terminated his employment and moved him to a different unit because Plaintiff practiced Christianity.

On November 15, 2012, Defendant Hale transferred Plaintiff to NSCF. Defendant Hale asserts that he transferred Plaintiff to "ensure that [Plaintiff] could not victimize Mr. Morales." (Doc. 144-2 at 3, ¶ 18.)  He further asserts that "the transfer was still necessary because Mr. Morales and [Plaintiff] continued to find ways to circumvent facility rules to find time alone together."  *Id.*

5

### B.   Plaintiff's Eighth Amendment Claim.

Plaintiff suffers from multiple sclerosis and has been prescribed injectable Interferon. While incarcerated, Plaintiff received these injections on Mondays, Wednesdays, and Fridays. During his transfer to NSCF, his Interferon medication was not transported with him and was thereafter sent to the wrong facility. As a result, Plaintiff did not receive his scheduled injection on Friday, November 16, 2012. When it was discovered that Plaintiff's medication had been sent to the incorrect facility, Defendants arranged for the medication to be "over-nighted" to NSCF. (Doc. 156-16 at 1.) Plaintiff received his injection on Sunday, November 18, 2012.

Plaintiff claims that the delay in receiving his scheduled injection of Interferon caused "[f]lare-ups of [multiple sclerosis] symptoms" and "new symptoms . . . that [a]ffect [him] to [the] present day." (Doc. 147-2 at 6.) Plaintiff also represents that missing the dose caused him "[s]evere mental and emotional distress and anguish" and posttraumatic stress disorder. *Id.* Plaintiff filed a series of Health Service Requests after his missed dosage. On November 17, 2012, Plaintiff complained of an unsteady gait, headaches, knee and neck pain, and difficulty sleeping, but he described these symptoms as preexisting. On November 19, 2012, he noted that "symptoms starting on [November 18, 2012] of [l]egs cramping up feels lik[e] muscles constricting[,] . . . pain in left foot, . . . [f]eels like I am on a boat rocking[.] Standing up or sitting down unsteady feeling. Headaches. Muscle [spasms] [l]eft tricep, [b]icep." (Doc. 156-20 at 5.) On November 20, 2012, Plaintiff stated that he was experiencing "new symptoms [and] difficulty" and that it was "incredibly worrisome[.]" *Id.* at 6. On November 22, 2012, he wrote, "[m]y equilibrium feels off more today. Numbing in right [a]rm. Pain in right [elbow] and knees. I am in an exas[p]eration. Need to contact [neurologists]. I fear condition worsening. This has been [ongoing] since end of October and progressively gotten worse. Vertigo." *Id.* at 7. On November 25, 2012, Plaintiff described the preceding night as "one of the wors[t] nights, pain wise." *Id.* at 8. On November 26, 2012, Plaintiff saw a healthcare provider. According to the provider's notes, Plaintiff's

6

multiple sclerosis was under a "[f]air" degree of control, but his clinical status was "[w]orsening[.]"  (Doc. 156-23 at 1.)

On November 28, 2012, DOC Health Services Director Delores Burroughs-Biron responded in writing to a grievance that Plaintiff had filed regarding the delayed injection.  In pertinent part, her letter states:

> Fortunately, the medication is long[-]acting and as such a portion remained in your system for the time you were late receiving your shot.  This is not to imply that the lapse should not have occurred and in speaking with the nursing staff it was the result of a couple of unintentional mis-steps and an emergency; 1) it was not sent with you; 2) when they attempted to send the medication it was sent to the wrong site.  Of note the nursing staff spoke with a provider who felt that a delay in medication of one day was acceptable based on the recommended dosage intervals.  The medication was over-nighted from the other site.

> The Department and [its medical service providers] apologize for any worry this may have caused you  The events have been reviewed and recommendations made as to how to best prevent this in the future.  The staff is also aware that you should have been notified of the problem and plans to fix it rather than your having to file a grievance.

(Doc. 156-16 at 1.)

Plaintiff alleges that "all of [Defendants'] actions" caused him "undue, chronic stress" and exacerbated his multiple sclerosis symptoms.  (156-13 at 1, ¶¶ 4, 6.)  Mental Health Progress Notes document Plaintiff's reports of stress and frustration arising from his transfer from NWSCF, his medical issues, and his belief that he was wrongfully convicted.

## II.  Procedural Background.

On January 8, 2013, Plaintiff filed a Complaint under 42 U.S.C. § 1983, alleging that a number of prison officials, including Defendants, violated his rights under the First, Eighth, and Fourteenth Amendments, as well as the Religious Land Use and Institutionalized Persons Act.  Plaintiff sought injunctive relief and compensatory damages against these prison officials in their official and individual capacities.  In his Amended Complaint, Plaintiff limited his claims to Defendants.

On April 17, 2013, Defendants filed their motion to dismiss, arguing that Plaintiff failed to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). The Magistrate Judge granted in part and denied in part the motion, leaving intact Plaintiff's claims that Defendants terminated his employment because of his religious activities in violation of his First Amendment Free Exercise rights; that Defendants retaliated against him for filing grievances in violation of his First Amendment Freedom of Expression rights; that Defendants violated his Fourteenth Amendment Due Process rights by terminating his employment and transferring him from NWSCF without sufficient process; and that Defendants violated his Eighth Amendment rights because they failed to administer his medication on schedule. Thereafter, the parties engaged in discovery, during which Plaintiff sought to compel Defendants' production of maps, diagrams, and photos of NWSCF. The Magistrate Judge denied the motion to compel without a written opinion. Discovery was closed on April 1, 2015.

On May 28, 2015 and June 1, 2015, Defendants filed motions for summary judgment. On June 29, 2015, Plaintiff moved to reopen discovery, claiming that in order to oppose the summary judgment motions, he needed access to photos and diagrams of NWSCF. The Magistrate Judge denied this motion, ruling that "disclosure of those materials would put the safety and security of NWSCF at risk." (Doc. 155.) On July 2, 2015, Plaintiff moved for leave to amend the Amended Complaint to add a defamation claim against Defendants.

On September 22, 2015, the Magistrate Judge issued his R & R recommending that Defendants' motions for summary judgment be granted and Plaintiff's motion for leave to amend be denied. On November 23, 2015, with extensions of time granted by the court, Plaintiff filed his objection to the R & R. Plaintiff objects to the R & R's conclusions: (1) denying him discovery of photos and diagrams that illustrate the layout of NWSCF; (2) finding that his employment termination and transfer to a different facility served penological and security interests; (3) finding that Defendants' actions were not unconstitutionally motivated by retaliation in violation of the Due Process Clause of the Fourteenth Amendment; (4) finding that his Eighth Amendment rights were

8

not violated by Defendants' delay in administering a medication; and (5) denying him the opportunity to amend his Amended Complaint to add claims for libel and slander. Defendants have filed a written response to each of these objections.

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

A district court judge must make a *de novo* determination of those portions of a magistrate judge's report and recommendation to which an objection is made. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1); *Cullen v. United States*, 194 F.3d 401, 405 (2d Cir. 1999). The district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1); *accord Cullen*, 194 F.3d at 405. A district judge, however, is not required to review the factual or legal conclusions of the magistrate judge as to those portions of a report and recommendation to which no objections are addressed. *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is 'material' . . . when it 'might affect the outcome of the suit under the governing law[,]'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004) (internal quotation marks omitted).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material

9

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [Rather], the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations, emphasis, footnote, and internal quotation marks omitted).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000); *see also McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006) ("'Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.'") (quoting *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).

Because Plaintiff is self-represented, the court must construe his filings "liberally and interpret[] [them] to raise the strongest arguments they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis and internal quotation marks omitted). Although the court ordinarily grants a self-represented litigant leave to amend, it need not do so when the claims are futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [the self-represented plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.").

## B.   Whether the Magistrate Judge Correctly Denied Plaintiff Discovery of Photos and Diagrams of NWSCF.

Plaintiff objects to the Magistrate Judge's decisions denying Plaintiff discovery of "photos, diagrams, and/or lay[]outs" of NWSCF. (Docs. 137, 155.) Plaintiff argues that these materials provided the "only way" he could "articulate how staff, for example, could monitor any contact between [Mr.] Morales and [Plaintiff.]" (Doc. 167 at 1.)

10

Plaintiff seeks these documents in order to establish that his termination from employment and transfer to another facility were unnecessary because Defendants could have monitored Plaintiff's contact with Mr. Morales via other means.

"A district court has broad discretion to manage pre-trial discovery[.]" *Wood v. Fed. Bureau of Investigation*, 432 F.3d 78, 84 (2d Cir. 2005). "Federal courts have repeatedly found good cause to limit discovery or disclosure of information implicating the safety and security of prisons." *Gardner v. Univ. of Conn. Health Ctr.*, 2013 WL 6073430, at *2 (D. Ct. Nov. 18, 2013) (citing to *Matson v. Hrabe*, 2013 WL 4483000, at *5 (D. Kan. Aug. 20, 2013); *Cooper v. Sely*, 2013 WL 146428, at *3 (E.D. Cal. Jan. 14, 2013); *Biscoe v. Garcia*, 2012 WL 3228820, at *1 (D. Ariz. Aug. 6, 2012); *Robinson v. Adams*, 2012 WL 912746, at *2-3 (E.D. Cal. Mar. 16, 2012)). The disclosure of materials revealing the layout of NWSCF would pose security risks, and Plaintiff's motions seeking these materials were therefore properly denied.

Even if these documents were discoverable, whether Defendants could have used other means to monitor Plaintiff's contact with Mr. Morales is immaterial to resolution of Defendants' motions for summary judgment. In deciding whether and how to limit contact between Plaintiff and Mr. Morales, Defendants were not required to choose the least restrictive means. *See Thornburgh v. Abbott*, 490 U.S. 401, 411 (1989) (holding that prison officials' conduct, alleged to have violated the plaintiffs' First Amendment rights, is not subject "to a strict 'least restrictive means' test"); *Duamutef v. Hollins*, 297 F.3d 108, 112 (2d Cir. 2002) (holding that "prison restrictions that implicate prisoners' constitutional rights may be upheld if they are reasonably related to legitimate penological interests") (internal quotation marks omitted). Because the documents sought by Plaintiff would not raise a genuine dispute of material fact, the Magistrate Judge did not err in denying Plaintiff discovery of these materials. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

11

C.     **Whether the Magistrate Judge Correctly Concluded that Defendants Were Motivated, In Part, By Penological and Security Interests When Terminating Plaintiff's Employment and Transferring Him to a Different Facility.**

Plaintiff alleges that Defendants retaliated against him for filing grievances and lawsuits by terminating his employment and transferring him to a different facility, in violation of the First Amendment's guarantee of Freedom of Expression. The Magistrate Judge concluded that Defendants proffered legitimate, non-retaliatory reasons for these actions—the desire to protect Mr. Morales and ensure the safety of inmates at the correctional facility. *See* Doc. 161 at 21. The Magistrate Judge concluded that these legitimate penological interests defeat Plaintiff's retaliation claims. *See id.* In his opposition to the R & R, Plaintiff argues that "all the penological needs had been met" when restrictions were imposed on Plaintiff's employment as assistant recreation coordinator, and that Defendants' actions thereafter did not serve non-retaliatory interests. (Doc. 167 at 2.)

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show [] '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). "Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action." *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003).

Plaintiff correctly asserts that filing grievances and lawsuits are protected activities. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."). Plaintiff also correctly characterizes Defendants' decision to terminate his employment and transfer him to a new facility as "adverse actions." *See Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) (holding that "prison authorities may not transfer an inmate in retaliation for the exercise of

12

constitutionally protected rights"); *Chavis v. Struebel*, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) (noting that "assigning the inmate [to] a less desirable work assignment satisfies the adverse action requirement" for purposes of a prisoner's First Amendment retaliation claim).

Plaintiff must also establish a causal connection between the protected activity and the adverse action "sufficient to support the inference that the [protected conduct] played a substantial part in the adverse action." *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003) (internal quotation marks omitted). "[T]emporal proximity of an allegedly retaliatory [adverse action] to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002); *see also Espinal*, 558 F.3d at 129 ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."). Drawing all reasonable inferences in Plaintiff's favor, because the termination of Plaintiff's employment and his transfer from NWSCF followed soon after his protected activity of filing grievances, Plaintiff has proffered sufficient evidence to establish a causal connection. *See Pinto*, 221 F.3d at 398 (holding that for purposes of deciding a summary judgment motion, the court must "resolv[e] all ambiguities and draw[] all inferences in favor of the non-moving party").

Having sufficiently established a *prima facie* First Amendment retaliation claim, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for their actions. "Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.,* that even without the improper motivation the alleged retaliatory action would have occurred." *Scott*, 344 F.3d at 287-88. "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999) (per curiam). In the context of prison administration, "the conclusion that the state action would have been taken in the absence of improper motives is readily drawn . . . [because] we have been cautioned to recognize that prison officials have broad administrative and

13

discretionary authority over the institutions they manage." *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (internal quotation marks omitted).

In this case, Defendants had legitimate, non-retaliatory reasons to terminate Plaintiff's employment and transfer him from NWSCF. In light of Mr. Morales's identification as "seriously functionally impaired," and Defendants' obligation to protect him from other inmates that might exploit his vulnerability, Defendants' decision to terminate Plaintiff's employment was reasonably tailored to minimize Plaintiff's access to Mr. Morales. *See* Doc. 144-2 at 2, ¶ 9 (providing that Plaintiff's employment had allowed him "to have unauthorized contact with Mr. Morales in unauthorized areas and permitted [Plaintiff] to facilitate the inappropriate relationship with Mr. Morales"). After terminating Plaintiff's employment, it is undisputed that that Plaintiff continued to spend significant amounts of time with Mr. Morales. To fulfill their duty to provide a safe and secure environment for prisoners, Defendants' decision to transfer Plaintiff from NWSCF in order to limit all contact between him and Mr. Morales was a legitimate, non-retaliatory decision that served a compelling penological interest. *See Salahuddin v. Goord*, 467 F.3d 263, 276 (2d Cir. 2006) (providing that "protecting inmate safety" is a "legitimate" and "compelling" penological interest).

Because Defendants would have terminated Plaintiff's employment and transferred him from NWSCF even if Plaintiff had not filed grievances or pursued litigation, Defendants have established "dual motivation" and are entitled to summary judgment with regards to Plaintiff's retaliation claims. *See Davidson*, 193 F.3d at 149 (holding that summary judgment is appropriate if "the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone").

### D.   Whether the Magistrate Judge Correctly Concluded that Plaintiff Did Not Suffer a Fourteenth Amendment Due Process Violation.

With regards to his Fourteenth Amendment Due Process claim, Plaintiff does not dispute that he does "not have a right to a certain job, living unit, or [housing] facility[.]" (Doc. 167 at 2.) He, however, asserts "rights as to being free from classification changes out of acts of retaliation." *Id.* The court construes Plaintiff's claim as alleging a "stigma

14

plus" claim under the Due Process Clause of the Fourteenth Amendment. *See Triestman*, 470 F.3d at 474 (directing the court to construe filings from self-represented parties to "raise the strongest arguments that they suggest") (emphasis and internal quotation marks omitted).

There is a constitutional right to be free from a false stigmatizing statement if it is coupled with the "deprivation of a tangible interest[.]" *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 (2d Cir. 2005); *see also Paul v. Davis*, 424 U.S. 693, 708-09 (1976) (requiring both the "stigma" resulting from a defamatory statement plus an alteration in legal status in order to find deprivation of a liberty interest warranting the safeguards of procedural due process). The Second Circuit has explained:

> To establish a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights. This state-imposed alteration of status or burden must be in addition to the stigmatizing statement. Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process.

*Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (citations and internal quotation marks omitted).

Defendants' internal notes cannot constitute a defamatory statement for Plaintiff's "stigma plus" claim because they reflected Defendants' concerns and mental impressions, which cannot be proven false. *See Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985) ("It is also clear that the determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court.") In addition, these statements were not made public and thus had no potential to injure Plaintiff's reputation. *See Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (holding that "a plaintiff must prove these stigmatizing statements were made public").

15

Because Defendants' remaining statements were made in court filings, they are privileged and cannot form the basis of Plaintiff's "stigma plus" claim. *See Okemo Mountain, Inc. v. Sikorski*, 2006 WL 335858, at *3 (D. Vt. Feb. 14, 2006) (holding that under Vermont law, "[d]efamatory statements published by parties in the course of judicial proceedings[] . . . are absolutely privileged, so long as they bear some relation to the proceedings"); *Sharpe v. City of New York*, 2013 WL 2356063, at *7 (E.D.N.Y. May 29, 2013) (holding that "[e]ven if these [] statements could be considered constitutionally stigmatizing[,] . . . they cannot support a 'stigma[]plus' claim because statements made in the course of court proceedings are absolutely privileged under New York common law") (internal quotation marks omitted). Even if these statements were not privileged, Plaintiff could not establish an alteration in legal status as a result of Defendants' statements made during this litigation. *See Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (explaining that, by itself, "[a] free-standing defamatory statement . . . is not a constitutional deprivation, but is instead properly viewed as a state tort of defamation") (internal quotation marks omitted).

Insofar as Plaintiff has alleged a "stigma plus" claim on the basis that other prisoners drew negative inferences about his employment termination and transfer from NWSCF, his claim is unsupported by any admissible evidence. *See O'Connor v. Pierson*, 426 F.3d 187, 195 (2d Cir. 2005) ("Even if [the plaintiff] is correct that townsfolk drew negative inferences from his suspension, this is not enough to make out a stigma-plus claim."). Plaintiff has thus failed to identify a "statement sufficiently derogatory to injure his or her reputation[.]" *See Vega*, 596 F.3d at 81.

Viewing the facts in the light most favorable to Plaintiff, the essential elements of a "stigma plus" claim have not been established, and Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment claim. *See Celotex Corp.*, 477 U.S. at 323 (holding that "[t]he moving party is entitled to a judgment as a matter of law [where] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof") (internal quotation marks omitted).

16

E.    **Whether the Magistrate Judge Correctly Concluded that Plaintiff's Eighth Amendment Claim Fails Because He Cannot Establish that Defendants Acted With Deliberate Indifference.**

Plaintiff asserts that he received a delayed injection of Interferon as a result of Defendants' conduct, in violation of the Eighth Amendment. The Magistrate Judge concluded that Plaintiff did not demonstrate that the alleged deprivation was "sufficiently serious" or that the state actors were subjectively reckless. (Doc. 161 at 26, 28.)

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments[.]" U.S. Const. amend. VIII. "An Eighth Amendment claim arising out of inadequate medical care requires a demonstration of 'deliberate indifference to [a prisoner's] serious medical needs.'" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "[T]he deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

"The objective component [of the deliberate indifference standard] requires that 'the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.'" *Hill*, 657 F.3d at 122 (quoting *Hathaway*, 99 F.3d at 553). "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone[,]" *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (emphasis omitted), to determine the "severity [and effect] of th[at] temporary deprivation[.]" *Id.* at 186 (emphasis and internal quotation marks omitted). "[T]he severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances[,] . . . [including whether the denial resulted in] adverse medical effects or demonstrable physical injury[.]" *Id.* at 187 (citation omitted).

In *Smith*, the plaintiff alleged that prison officials violated his Eighth Amendment rights by depriving him of his HIV medication on two separate occasions. 316 F.3d at

17

180-81. On the first occasion, the plaintiff missed his scheduled doses for seven days because there was "a delay in refilling [the plaintiff's] prescriptions after his existing medication ran out." *Id.* at 181. On the second occasion, the plaintiff was not administered medication for five days because his medication "was confiscated during a random search of his living quarters." *Id.* He did not, however, "complain about the general level of HIV treatment that he received while incarcerated[.]" *Id.* at 185. The court concluded that "HIV is a serious medical condition that requires medical treatment." *Id.* Nonetheless, the harm resulting from the missed medication doses was not "sufficiently serious to establish a claim under the Eighth Amendment." *Id.* at 189. In reaching this conclusion, the court noted that the plaintiff "presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, . . . [and] the defendants presented credible medical testimony suggesting that [the plaintiff] had not been exposed to an unreasonable risk of future harm due to the periods of missed HIV medication." *Id.* at 188-89 (footnote omitted).

Here, the inquiry must focus on the severity and effect of the delay resulting from Plaintiff's missed dosage of Interferon. *See Smith*, 316 F.3d at186. Plaintiff received an Interferon injection two days after it was due. Defendants have proffered evidence that this delay in treatment did not constitute inadequate treatment or cause Plaintiff any serious or permanent harm, as, during the time in question, Plaintiff did not receive a dose of Interferon during each weekend without adverse consequences. Defendants have proffered admissible evidence that Interferon is a "long[-]acting" medication, such that it remained in Plaintiff's "system for the time [he was] late receiving [his] shot." (Doc. 156-16 at 1.) Although Plaintiff reported that his symptoms worsened as a result of the delayed injection, he also reported that his symptoms had been worsening "since [the] end of October" and had "progressively gotten worse." (Doc. 156-20 at 7.) Even when considered in the light most favorable to Plaintiff, the delay in question was not "sufficiently serious to establish a claim under the Eighth Amendment." *See Smith*, 316 F.3d at 189.

18

Plaintiff's Eighth Amendment claim fails for the further reason that he cannot establish the subjective component of the "deliberate indifference" standard. "[T]he charged officials must [have been] subjectively reckless in their denial of medical care." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). "This means 'that the charged official [must] act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result.'" *Id.* (quoting *Salahuddin*, 467 F.3d at 280). The subjective component thus "entails something more than mere negligence, . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). The prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

In this case, Plaintiff's medication was accidentally sent to the incorrect facility. When this error was realized, Defendants took measures to ensure that Plaintiff could receive an injection as soon as possible. Such conduct does not display that Defendants knew and disregarded "an excessive risk to inmate health or safety[.]" *Id.* Because Defendants' conduct does not "entail[] something more than mere negligence," Plaintiff has not established that Defendants acted with "deliberate indifference[.]" *See id.* at 835. Defendants are therefore entitled to summary judgment on Plaintiff's Eighth Amendment claim. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998) (holding that "summary judgment under Rule 56 is . . . mandated[] when the evidence is insufficient to support the non-moving party's case").

### F.     Whether the Magistrate Judge Correctly Concluded that Granting Plaintiff Leave to Amend Would Be Futile.

Plaintiff seeks leave to amend in order to assert a defamation claim against Defendants. Plaintiff's proposed defamation claim is based on statements that Defendants allegedly made in the course of this litigation, and which suggest that "Plaintiff is a homosexual and a sexual predator." (Doc. 151 at 1.) The Magistrate Judge

concluded that granting Plaintiff the opportunity to assert a defamation claim would be futile because, after granting Defendants' motions for summary judgment, the court should not exercise supplemental jurisdiction over Plaintiff's proposed state-law claim. (Doc. 161 at 30.) Additionally, the Magistrate Judge concluded that even if jurisdiction were proper, absolute immunity would likely shield Defendants from Plaintiff's proposed defamation claim. *Id.* at 31.

Pursuant to Fed. R. Civ. P. 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." The Second Circuit has held that a Rule 15(a) motion "should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and . . . prejudice to the opposing party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005) (internal quotation marks omitted). An amendment is futile if it results in a claim that cannot survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1) or Fed. R. Civ. P. 12(b)(6). *See Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Ger.*, 615 F.3d 97, 99 (2d Cir. 2010) (holding that "leave to amend would be futile" when the amended complaint fails to "provid[e] a basis for subject matter jurisdiction"); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6).").

"A federal court has [supplemental] jurisdiction over state law claims whenever a federal law claim confers subject matter jurisdiction on the court and both claims 'derive from a common nucleus of operative fact.'" *Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1054 (2d Cir. 1990) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). 28 U.S.C. § 1367(c) provides that a district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" When deciding whether to exercise supplemental jurisdiction over state law claims after no federal law claims remain, the court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to

20

exercise [supplemental] jurisdiction[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

> While [Supreme Court] decisions indicate that dismissal of the state claims is not absolutely mandatory, when all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.

*Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988) (citations and internal quotation marks omitted).

Plaintiff's proposed state-law claim concerns matters that share a "common nucleus of operative fact" with Plaintiff's federal claims, namely Defendants' response to Plaintiff's potential threat to Mr. Morales. However, the court has concluded that dismissal of Plaintiff's federal claims is proper, and thus may "decline to exercise supplemental jurisdiction" over Plaintiff's proposed state-law claims. *See* 28 U.S.C. § 1367(c). In light of the fact that Plaintiff's proposed defamation claim would be alleged for the first time in a late stage of the proceedings, judicial economy, convenience, and fairness weigh against exercising supplemental jurisdiction. *See Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176, 1183 (2d Cir. 1974) (noting that it is "well within the judge's discretion to refuse to consider the state[-law] claims [] at [a] late stage" in the proceedings); *see also Murphy v. Cuomo*, 913 F. Supp. 671, 681 (S.D.N.Y. 1996) ("Because plaintiff is attempting to interpose a [state-law] claim at this late stage[,] . . . the [c]ourt would decline to exercise jurisdiction over it because summary judgment has been granted on all of plaintiff's federal claims against [the defendant]."). In addition, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726.

The Magistrate Judge correctly concluded that supplemental jurisdiction should not be exercised over Plaintiff's proposed defamation claim. *See Cohill*, 484 U.S. at 350 n.7 (noting that "in the usual case in which all federal-law claims are eliminated before

trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims"). This conclusion is underscored by the fact that Plaintiff's proposed defamation claim would be futile because Vermont law recognizes a litigation privilege that extends to statements within documents filed in a judicial proceeding. *See O'Connor v. Donovan*, 2012 VT 27, ¶ 26, 191 Vt. 412, 427, 48 A.3d 584, 594 (recognizing that "[a] witness is absolutely privileged to publish defamatory matter . . . as a part of a judicial proceeding in which he is testifying") (internal quotation marks omitted); *Pease v. Windsor Dev't Review Bd.*, 2011 VT 103, ¶ 28, 190 Vt. 639, 645, 35 A.3d 1019, 1027 (noting that the doctrine of "[l]itigation immunity . . . protects parties, witnesses, lawyers, and judges as participants in the judicial process from liability for acts and conduct related to a proceeding") (internal quotation marks omitted).

Because Plaintiff's proposed defamation claim is based upon privileged statements, granting leave to amend would be futile. *See Dougherty*, 282 F.3d at 88 ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."). The Magistrate Judge thus properly denied Plaintiff leave to amend.

## CONCLUSION

For the foregoing reasons, the court hereby ADOPTS the Magistrate Judge's R & R in its entirety (Doc. 161).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 7th day of January, 2016.

Christina Reiss, Chief Judge
United States District Court

22